**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| STEVEN CURD and REBEL CURD, Derivatively on Behalf of SEI INTERNATIONAL EQUITY FUND, SEI HIGH YIELD BOND FUND, SEI TAX-MANAGED LARGE CAP FUND, SEI TAX-MANAGED SMALL/MID CAP FUND, and SEI INTERMEDIATE-TERM MUNICIPAL FUND, | ) ) ) ) ) ) ) ) )   Case No. 2: 13-cv-07219 |
| Plaintiffs, | ) ) |
| v. | ) ) |
| SEI INVESTMENTS MANAGEMENT CORPORATION, | ) ) ) |
| Defendant. | ) ) ) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S**
**<u>MOTION TO DISMISS THE COMPLAINT</u>**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................ 3

I.  OVERVIEW OF MUTUAL FUNDS ......................................................... 3

    A.  Mutual Fund Structure ...................................................................... 3

    B.  Use of Sub-Advisers ......................................................................... 5

II. OVERVIEW OF THE SEI FUNDS AND SIMC ........................................ 6

    A.  The SEI Funds ................................................................................... 6

    B.  The Advisory Agreements ................................................................. 8

    C.  The Sub-Advisory Agreements ......................................................... 9

    D.  SIMC, Not the Sub-Advisers, is Responsible for the Overall Management and Investment Performance of the Funds ......................................... 10

    E.  SIMC's Disclosures Show That SIMC Performs A Huge Amount Of Work ................................................................................................. 11

        1.  SIMC's Sub-Adviser Selection Process .................................. 11

        2.  SIMC Continuously Monitors the Sub-Advisers And Reallocates Assets ....................................................................................... 12

        3.  In An Effort to Improve Performance, SIMC Added or Changed Sub-Advisers Frequently ......................................................... 13

    F.  Compensation of SIMC and Sub-Advisers ..................................... 13

III. BOARD APPROVAL OF ADVISORY AGREEMENT AND ADVISORY FEES ...... 15

    A.  Overview of Regulatory Scheme .................................................... 15

    B.  The SEI Funds' Board of Trustees and the Advisory Agreement Approval Process ............................................................................ 16

        1.  The Board of Trustees ............................................................. 16

        2.  The Independent Trustees ........................................................ 16

        3.  Advisory Agreement Approval Process ................................... 17

ARGUMENT ...................................................................................................... 20

I.  UNDER THE RELEVANT PLEADING STANDARD, THE COURT MUST ASSESS THE FACTS ALLEGED AND DISMISS THE COMPLAINT IF THOSE FACTS FAIL TO SUPPORT A PLAUSIBLE CLAIM FOR RELIEF ............ 21

II. *JONES* IMPOSES A DEMANDING STANDARD ON PLAINTIFFS SEEKING TO SECOND-GUESS THE INDEPENDENT TRUSTEES' JUDGMENT REGARDING MUTUAL FUND FEES ........................................................ 22

**TABLE OF CONTENTS**
(continued)

**Page**

III. PLAINTIFFS FAIL TO ALLEGE FACTS CALLING INTO QUESTION THE INDEPENDENCE OR THOROUGHNESS OF THE INDEPENDENT TRUSTEES .......................................................................................... 24

    A. Plaintiffs Fail To Allege Facts Showing That The Independent Trustees Were Not Independent ............................................................. 24

    B. Plaintiffs Fail To Allege Facts Showing That The Board Process Was Deficient ........................................................................................ 25

IV. PLAINTIFFS' PLEADING FAILS TO STATE A CLAIM UNDER THE SUPREME COURT'S STANDARD .......................................................... 29

    A. Plaintiffs Fail To Allege That The Nature and Quality Of The Services Provided By SIMC Did Not Warrant SIMC's Compensation ........................... 29

        1. Plaintiffs' Allegations That SIMC Performs "Almost No Work" Are Contrary To Plaintiffs' Own Admissions .......................... 30

        2. Plaintiffs' Allegations That SIMC Performs "Almost No Work" Are Contrary To Documents Upon Which Plaintiffs Rely ............ 31

        3. Plaintiffs' Allegation That the Board's Oversight Role Minimizes SIMC's Responsibilities Makes No Sense ............. 33

        4. Plaintiffs Do Not Allege That SIMC's Services Were Not Of High Quality .......................................................................... 34

        5. SIMC Retains Less Than Half Of The Total Advisory Fees Paid By The Funds and Plaintiffs Make No Allegations Covered by Section 36(b) ..................................................................... 34

    B. Plaintiffs Fail To Plead Any Facts Showing That Economies Of Scale Existed Or That Economies Of Scale Were Not Shared With Investors ............ 36

        1. Plaintiffs Plead No Facts Showing That Economies Of Scale Existed ..................................................................................... 36

        2. Plaintiffs Plead No Facts Showing that Economies of Scale Were Not Passed on to Investors ...................................................... 37

    C. Plaintiffs Plead No Facts Regarding SIMC's Profitability ......................... 38

    D. Plaintiffs Allege No Facts Regarding Comparative Fee Structures Or Fall-Out Benefits .......................................................................................... 40

V. PLAINTIFFS' COMPLAINT ALSO FAILS FOR THE INDEPENDENT REASON THAT PLAINTIFFS MAKE NO TIMELY CLAIM ABOUT SIMC'S FEES ................................................................................................... 41

VI. THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE .................. 42

## TABLE OF AUTHORITIES

CASES

*ALA, Inc. v. CCAIR, Inc.*,
   29 F.3d 855 (3d Cir. 1994)........................................................................21, 31

*Alexander v. Allianz Dresdner Asset Mgmt. of Am. Holding, Inc.*,
   509 F. Supp. 2d 190 (D. Conn. 2007).................................................................24

*Amron v. Morgan Stanley Inv. Advisors Inc.*,
   464 F.3d 338 (2d Cir. 2006)...........................................................25, 26, 36, 42

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)........................................................................................21

*Benak ex rel. the Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P.*,
   No. CIV.A. 01-5734, 2004 WL 1459249 (D.N.J. Feb. 9, 2004) ...........................24

*Buerhle v. Hahn*,
   No. 13-3474 2014 WL 123333 (E.D. Pa. Jan. 14, 2014).........................................7

*Burks v. Lasker*,
   441 U.S. 471 (1979).....................................................................................4, 23

*Daily Income Fund, Inc. v. Fox*,
   464 U.S. 523 (1984)........................................................................................22

*Fowler v. UPMC Shadyside*,
   578 F.3d 203 (3d Cir. 2009)..............................................................................21

*Gartenberg v. Merrill Lynch Asset Management, Inc.*,
   694 F.2d 923 (2d Cir. 1982)..............................................................................22

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
   573 F. Supp. 1293 (S.D.N.Y. 1983)....................................................................39

*Hamilton v. Allen*,
   396 F. Supp. 2d 545 (E.D. Pa. 2005) ..................................................................24

*Hoffman v. UBS-AG*,
   591 F. Supp. 2d 522 (S.D.N.Y. 2008).....................................................24, 37, 38

*In re Am. Mut. Funds Fee Litig.*,
   No. 04-5593, 2009 WL 5215755 (C.D. Cal. Dec. 28, 2009)......................23, 38, 39

*In re Dreyfus Mut. Funds Fee Litig.*,
   428 F.Supp.2d 342 (W.D.Pa. 2005)....................................................................41

*In re Franklin Mut. Funds Fee Litig.*,
    478 F. Supp. 2d 677 (D.N.J. 2007) ....................................................................27, 37, 38, 41

*In re Goldman Sachs Mut. Funds*,
    No. 04 CIV. 2567 (NRB), 2006 WL 126772 (S.D.N.Y. Jan. 17, 2006)..........................24, 37

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,
    528 F. Supp. 2d 332 (S.D.N.Y. 2007)........................................................................24, 26, 34

*In re Scudder Mut. Funds Fee Litig.*,
    No. 04 CIV. 1921 (DAB), 2007 WL 2325862 (S.D.N.Y. Aug. 14, 2007) .................24, 36, 37

*In re Walnut Leasing Co.*,
    No. 99-526, 1999 WL 729267 (E.D. Pa. Sept. 8, 1999) ...................................................21, 30

*Jones v. Harris Assocs., L.P.*,
    559 U.S. 335 (2010) ........................................................................................................ *passim*

*Kalish v. Franklin Advisers, Inc.*,
    742 F.Supp. 1222 (S.D.N.Y. 1990) .......................................................................................40

*Kasilag v. Hartford Investment Financial Services, LLC*,
    CIV. A. No. 11-083, 2012 WL 6568409 (D.N.J. Dec. 17, 2012).....................................40, 41

*Krantz v. Prudential Invs. Fund Mgmt., LLC*,
    305 F.3d 140 (3d Cir. 2002)....................................................................................................24

*Krinsk v. Fund Asset Mgmt., Inc.*,
    715 F.Supp. 472 (S.D.N.Y. 1988) .........................................................................................39

*Meyer v. Oppenheimer Mgmt. Corp.*,
    707 F.Supp. 1394 (S.D.N.Y. 1988) .......................................................................................39

*Migdal v. Rowe Price-Fleming Int'l Inc.*,
    248 F.3d 321 (4th Cir. 2001) ......................................................................................25, 26, 34

*Migdal v. Rowe Price-Fleming Int'l, Inc.*,
    No. AMD 98-2162, 2000 WL 350400 (D. Md. Mar. 20, 2000) .............................................24

*Mintz v. Baron*,
    No. 05CIV.4904(LTS)(HBP), 2009 WL 735140 (S.D.N.Y. Mar. 20, 2009) .........................24

*Schuyt v. Rowe Price Prime Reserve Fund, Inc.*,
    663 F.Supp. 962 (S.D.N.Y. 1967) .........................................................................................39

*Sowemimo v. Thomas*,
    No. CIV.A. 09-639, 2009 WL 3806737 (W.D. Pa. Nov. 13, 2009) .......................................30

*Strougo v. BEA Associates*,
    188 F. Supp. 2d 373 (S.D.N.Y. 2002) ............................................................24, 25

*Sullivan v. DB Invs., Inc.*,
    667 F.3d 273 (3d Cir. 2011) ...........................................................................42

*Villari Brandes & Giannone, PC v. Wells Fargo Fin. Leasing, Inc.*,
    No. CIV.A. 13-297, 2013 WL 5468497 (E.D. Pa. Sept. 30, 2013) ................................31

*Yampolsky v. Morgan Stanley Inv. Advisers Inc.*,
    No. 03 CIV. 5710 (RO), 2004 WL 1065533 (S.D.N.Y. May 12, 2004) .........................24, 36

**STATUTES**

15 U.S.C. § 80a-1 et seq. .................................................................................4

15 U.S.C. § 80a-2 .......................................................................................15, 24

15 U.S.C. § 80a-10 .........................................................................................15

15 U.S.C. § 80a-15 .........................................................................................15

15 U.S.C. § 80a-17 .........................................................................................34

15 U.S.C. § 80a-35 ...................................................................................22, 35, 41

**OTHER AUTHORITIES**

1 Clifford E. Kirsch, Mutual Funds and Exchange Traded Funds Regulation § 6 ..................5, 33

2 Clifford E. Kirsch, Mutual Funds and Exchange Traded Funds Regulation § 42 ..................5, 6

INVESTMENT COMPANY INSTITUTE, *2013 Investment Company Fact Book* (2013).......................4

## INTRODUCTION

The Investment Company Act of 1940 ("ICA") makes the independent trustees who sit on a mutual fund's board (the "Independent Trustees") primarily responsible for protecting the fund and its shareholders in their dealings with the manager of the fund, *i.e.*, the "adviser."  In the words of the United States Supreme Court, these Independent Trustees function as the "watchdogs" of the relationship between the fund and the adviser.  This role is especially important with regard to fee arrangements between the adviser and the fund.  Respecting this watchdog role, the Supreme Court has ruled that, if the trustees are independent and have engaged in a thorough process to determine the appropriateness of the fee arrangement, courts should not "second-guess" their business judgment.  To the contrary, the judiciary should afford deference to the judgments of the trustees; it is therefore not the role of the judiciary to make its own evaluation of the "reasonableness" of the fees.

Here, the funds' Independent Trustees, after an intensive and rigorous process guided by sophisticated independent counsel, arrived at what they concluded was a reasonable fee arrangement with the funds' adviser, SEI Investment Management Corporation ("SIMC").  Nevertheless, Plaintiffs seek to recover on the grounds that the fees paid to SIMC were "excessive" in violation of Section 36(b) of the ICA.  To state a claim, Plaintiffs must do more than allege, in a conclusory fashion, that the fees the funds paid were too high.  Rather, they must allege *facts* satisfying a strict standard adopted by the Supreme Court for overturning the "considerable weight" to be given to judgment of the Independent Trustees.  Plaintiffs must allege specific facts showing that the Independent Trustees so failed in their duty as to permit SIMC to charge "a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining."  *Jones*

1

*v. Harris Assocs., L.P.*, 559 U.S. 335, 345-46 (2010).  Plaintiffs do not come close to clearing the hurdle erected by the Supreme Court.

Plaintiffs make no factual allegations showing that the Board's decision should be overturned.  The crux of Plaintiffs' complaint is that SIMC performed "almost no work," because it was sub-advisers that SIMC hired -- and not SIMC itself -- that provided most, if not all, of the management services to the funds.  Therefore, Plaintiffs allege that, even though SIMC retains only 37% of the overall fees paid -- with the remaining 63% going *to the sub-advisers* -- the portion going to SIMC was too high, making the overall fees "excessive."  However, Plaintiffs themselves admit -- and rely on documents which make clear -- that SIMC performs a host of significant tasks that materially benefit the funds.  For example, SIMC sets the investment strategy of each fund and then constructs the funds' portfolios by carefully selecting -- following extensive due diligence -- a mix of sub-advisers.  It also decides how to allocate the fund's assets among those sub-advisers.  SIMC then actively monitors the performance of the sub-advisers to ensure that they comply with the funds' investment policies and guidelines.  Based on its ongoing review, SIMC adjusts the allocation of the assets among the multiple sub-advisers.  Importantly, SIMC also recommends when the funds' Board of Trustees should terminate, maintain, or replace the existing sub-advisers, and when the Board should appoint additional sub-advisers.  Additionally, SIMC is responsible for overall risk management and reporting to the Board on the performance and operations of the funds.  In recognition of the role SIMC is obligated to play, the funds' contracts with SIMC, and SIMC's contracts with the sub-advisers, provide that SIMC -- not the sub-advisers -- is responsible for the overall management of the mutual funds.

Plaintiffs' admissions, and the documents they rely upon, directly refute their naked assertion that SIMC performs "almost no work" and that, as a result, SIMC's fees were "excessive."  Stripped of these baseless conclusions, Plaintiffs offer no answer to the key question posed by their Complaint:  why should the Court disregard the Independent Trustees' informed business judgment that SIMC, in exchange for performing the high level services outlined in its advisory agreements, is entitled to receive substantially *less than half* of the fees paid by the funds?

In short, Plaintiffs' allegations fall far short of stating a claim under the Supreme Court's unusually high standard, which respects the role and the business judgments of Independent Trustees.  Plaintiffs fail to plead facts calling into question the independence of the Independent Trustees; provide no plausible basis to conclude that the process utilized by the Independent Trustees and their independent legal counsel was not thorough; and do not articulate any *facts* which suggest that SIMC's fees are higher than what an arms-length process could produce.  Accordingly, Plaintiffs' Complaint should be dismissed in its entirety.


**FACTUAL BACKGROUND**

## I.      OVERVIEW OF MUTUAL FUNDS

### A.      Mutual Fund Structure

"A mutual fund is a pool of assets, consisting primarily of [a] portfolio [of] securities, and belonging to the individual investors holding shares in the fund."  *Jones*, 559 U.S. at 338.  A mutual fund typically is organized as a business trust or corporation under state law.  When organized as a trust, the trust will often have multiple portfolios (represented by separate share classes) which are commonly known as funds.  Each fund may have different investment objectives, policies, and potential investors.

Unlike most other entities, a mutual fund does not have employees of its own.  Rather, it is externally managed and relies on third parties "to invest fund assets and carry out other business activities."  INVESTMENT COMPANY INSTITUTE, *2013 Investment Company Fact Book* (2013) Appx. A.  Most often, "[a] separate entity called an investment adviser creates the mutual fund . . . .  The adviser selects the fund's directors, manages the fund's investments, and provides other services."  *Jones*, 559 U.S. at 338.  The investment adviser has "overall responsibility for the fund's investments and handling its business affairs."  INVESTMENT COMPANY INSTITUTE, *2013 Investment Company Fact Book* (2013) Appx. A.  In return for managing the fund, an adviser receives a fee, often calculated as a percentage of the net assets of the fund.

Mutual funds are regulated by the ICA.  *See* 15 U.S.C. § 80a-1 et seq.  The ICA requires a mutual fund to have a board of directors or trustees; funds organized as a trust will have a board of trustees.  A vital function of a trust board, and, in particular, its Independent Trustees, is to protect shareholders against the possibility of overreaching by the fund's investment adviser.  The ICA gives the Independent Trustees "a host of special responsibilities," including that "they must review and approve the contracts of the investment adviser annually, and a majority of these directors must approve an adviser's compensation."  *Jones*, 559 U.S. at 340 (internal citations and quotations omitted).

As the Supreme Court has recognized, Congress structured the ICA to place the Independent Trustees in the role of "independent watchdogs" who "furnish an independent check upon the management of investment companies."  *Burks v. Lasker*, 441 U.S. 471, 484 (1979).  The ICA entrusts to the Independent Trustees "the primary responsibility for looking after the interests of the funds' shareholders."  *Id*. at 484-85.   In recognition of this crucial role, the Supreme Court has explained that the ICA "does not call for judicial second-guessing of

informed board decisions" and that "[w]here a board's process for negotiating and reviewing investment-adviser compensation is robust, a reviewing court should afford commensurate deference to the outcome of the bargaining process." *Jones*, 559 U.S. at 351.

### B.     Use of Sub-Advisers

Many mutual funds are managed using a "manager of managers" structure.  Under this model, the investment adviser typically "maintains overall responsibility for the management of the fund . . . but allocates management of some or all of the assets of the fund to one or more sub-advisers." 1 Clifford E. Kirsch, Mutual Funds and Exchange Traded Funds Regulation § 6 (3d ed. 2013).  In these arrangements, "the sub-advisers are likened to individual portfolio managers employed by traditional investment company advisory firms." *Id*.  In a sub-advised fund, the adviser's duties typically include the following:

- Supervising the general management and setting the overall investment strategies of the fund

- Evaluating, selecting, and recommending the sub-advisers to manage all or a part of the fund's assets

- Allocating and reallocating the fund's assets among multiple sub-advisers

- Monitoring and evaluating the portfolio management services provided by each sub-adviser and the investment performance of the fund

- Implementing procedures reasonably designed to ensure that the sub-advisers comply with the fund's investment objectives, policies, and restrictions

- Advising and consulting with the board of directors of the fund with respect to matters relating to the investment operations of the fund and the adviser's and sub-advisers' discharge of their duties

 2 Clifford E. Kirsch, Mutual Funds and Exchange Traded Funds Regulation § 42 (3d ed. 2013).

Investment advisers rely on sub-advisers for a variety of reasons.  For instance, the use of sub-advisers allows a fund "to have an investment focus, style, or objective beyond the particular

expertise of the investment adviser's existing staff, helping the investment adviser to fill in gaps in its existing suite of funds without the need for extensive new resources." *Id*. The use of sub-advisers also allows an adviser to utilize the skills and reputation of recognized investment managers in a particular investment field or asset class. Additionally, funds may use multiple sub-advisers to diversify investment styles and strategies. *See id*.

The use of multiple sub-advisers -- rather than a single sub-adviser -- presents increased complexities. *See id*. Where multiple sub-advisers are used, the adviser must not only select the sub-advisers and then monitor and evaluate their performance, but also must allocate and re-allocate the fund's assets among the sub-advisers. Additionally, "issues stem from the fact that each sub-adviser is managing a discrete portion of the fund without consultation or coordination with the other sub-advisers." *Id*. For example, the adviser may need to monitor and address investments by multiple sub-advisers in the same industry to ensure that the fund's aggregate investments do not run afoul of an investment restriction with respect to industry concentration. *See id*.

## II.   OVERVIEW OF THE SEI FUNDS AND SIMC

### A.   The SEI Funds

SIMC, a wholly-owned subsidiary of SEI Investments Company ("SEIC"), is the investment adviser for the funds in the SEI fund complex, including the five funds at issue in the Complaint (the "SEI Funds" or the "Funds"). Each of the SEI Funds is a separate portfolio of an open-end managed investment company established as a Massachusetts business trust (the "Trusts").[1] The Funds have different investment objectives and strategies, as disclosed in the

---

[1] Open-end managed investment companies offer redeemable securities that investors can sell back to the fund on any business day at the fund's current net asset value per share. 1 Clifford E. Kirsch § 1A (3d ed. 2013).

Funds' public filings with the Securities and Exchange Commission ("SEC").  Key aspects of the

Funds are summarized below:[2]

| Fund | Trust | Investment Objective | Key Investment Strategies |
|---|---|---|---|
| **International Equity Fund**[3] | SEI Institutional International Trust | Long-term capital appreciation | The Fund invests at least 80% of its net assets in equity securities, diversified among issuers in at least three countries other than the United States.<br><br>The Fund invests "primarily in companies located in developing countries," but also may invest in companies located in "emerging markets." |
| **High Yield Bond Fund**[4] | SEI Institutional Managed Trust | Maximize total return | The Fund invests at least 80% of its net assets in high yield fixed income securities, primarily securities rated below investment grade, including corporate bonds and collateralized debt obligations.<br><br>SIMC "may also directly manage a portion of the Fund's portfolio." |

---

[2] The Court may consider "matters of public record" and other "undisputedly authentic document[s]" upon which Plaintiffs' claims are based.  *See, e.g., Buerhle v. Hahn*, No. 13-3474 2014 WL 123333, *2 (E.D. Pa. Jan. 14, 2014) ("a court may consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case . . . [f]urther, a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document") (internal citations omitted).

Relevant excerpts of the documents are attached as exhibits to the Declaration of Michael S. Doluisio in Support of Defendant's Motion to Dismiss the Complaint.  For simplicity, we refer to the documents hereinafter by the document's name only and without reference to the Declaration.

[3] SIIT Statement of Additional Information ("SAI") (1/31/2013) at S-1.

[4] SIMT SAI (1/31/2013) at S-16.

| Tax-Managed Large Cap Fund[5] | SEI Institutional Managed Trust | High long-term after-tax returns | The Fund invests at least 80% of its net assets in equity securities of large companies.<br><br>To manage tax implications, one of the sub-advisers acts as an "overlay manager." |
|---|---|---|---|
| Tax-Managed Small/Mid Cap Fund[6] | SEI Institutional Managed Trust | High long-term after-tax returns | The Fund invests at least 80% of its net assets in equity securities of small and medium capitalization companies.<br><br>To manage tax implications, the sub-advisers are to "look to the impact of taxes by controlling portfolio levels" and advantageously select stocks to sell or purchase depending on the corresponding tax consequences. |
| Intermediate-Term Municipal Fund[7] | SEI Tax Exempt Trust | Achieve the "highest level of income exempt from federal income tax as is consistent with the preservation of capital." | The Fund invests at least 80% of its net assets in "investment grade municipal securities that pay interest that is exempt from federal income tax, including but not limited to, municipal bonds, notes and commercial paper." |

## B.    The Advisory Agreements

An agreement between a mutual fund and the adviser with respect to the management of a fund is called an "Advisory Agreement."  Here, each Trust and SIMC annually entered into an Advisory Agreement whereby SIMC agreed to provide investment management services to the Funds.  SIMC's duties under this Agreement include:

- Managing the investment and reinvestment of the Funds' assets

---

[5]    SIMT SAI (1/31/2013) at S-3.

[6]    SIMT SAI (1/31/2013) at S-8.

[7]    STET SAI (12/31/2012) at S-1.

- Hiring -- subject to Trust Board approval -- such sub-advisers as SIMC deems necessary to carry out the Funds' investment program

- Supervising the investment activities of the sub-advisers

- "Continuously" reviewing and supervising the Funds' investment programs

- Where appropriate, administering the Funds' investment programs

- Where appropriate, determining the securities to be purchased and sold

- Providing the Funds' administrator and the Trust with records concerning SIMC's activities

- Regularly reporting to the Funds' administrator, the Trust's officers, and the Board of Trustees concerning SIMC's discharge of its responsibilities

(Compl. ¶ 20.) SIMC further agreed to ensure that all of its services are performed "in compliance with the objectives, policies, and limitations" for each Fund. *E.g.*, Investment Advisory Agreement SEI Institutional International Trust (Dec. 17, 2002) ("Advisory Agreement") ¶ 1. Moreover, under the Advisory Agreement, SIMC agreed to provide all personnel, office space, furnishings and equipment needed to perform its services. *Id.*

## C.    The Sub-Advisory Agreements

As contemplated by the Advisory Agreement, SIMC contracted with various sub-advisers for each Fund. In general, these sub-advisory agreements provide that each sub-adviser will perform the following services, "subject to the supervision of" SIMC and the Trust Boards:

- Manage the securities that SIMC allocates to it (the "Assets")[8]

---

[8]    Plaintiffs' assertion that "[a]ll of the SEI Funds' assets are managed by sub-advisers" (Compl. ¶ 22.) is incorrect. SIMC directly manages assets in the High Yield Bond Fund. *See* SIMT Prospectus (1/31/2013) at 113 (SIMC "may, to a limited extent, directly manage a portion of the Fund's portfolio."). Additionally, SIMC directly manages the cash portion of the International Equity Fund, Tax-Managed Large Cap Fund, and Tax-Managed Small/Mid Cap Fund. *See* SIIT SAI (1/31/2013) at S-41; SIMT SAI (1/31/2013) at S-59.

- "[I]n consultation with and subject to the direction of" SIMC, determine what Assets will be purchased, retained or sold by the Fund, and what portion of the Assets will be invested or held uninvested in cash

- Keep and maintain certain required books and records relating to the Assets

- Provide the Fund's custodian each business day with information relating to all transactions concerning the Assets

- Provide SIMC or the Board of Trustees periodic and special reports, balance sheets or financial information, or such other information regarding its affairs as SIMC or the Board reasonably requests

- Provide the Fund with information and advice regarding the Assets to assist the Fund in determining the appropriate valuation of the Assets

(Compl. ¶ 21).

The Advisory and Sub-Advisory Agreements make plain that SIMC is responsible for coordinating the activities of the various sub-advisers.  In fact, the Sub-Advisory Agreements provide that each "Sub-Adviser shall *not* consult with any other sub-adviser to a Fund or a sub-adviser to a portfolio that is under common control with a Fund concerning the Assets, except as permitted by the policies and procedures of a Fund."  *E.g.*, Investment Sub-Advisory Agreement SEI Institutional International Trust and del Rey Global Investors, LLC (Mar. 31, 2011) ("Sub-Advisory Agreement") ¶ 1(j) (emphasis added).

### D.     SIMC, Not the Sub-Advisers, is Responsible for the Overall Management and Investment Performance of the Funds

The Advisory Agreement and Sub-Advisory Agreements make clear that SIMC cannot delegate its own contractual responsibilities to the sub-advisers.  Rather, SIMC retains responsibility for all services under the Advisory Agreement and bears ultimate responsibility for the management of the Funds.  In particular, the Advisory Agreement provides that the "retention of a sub-adviser by the Adviser ***shall not*** relieve the Adviser of its responsibilities under this Agreement."  (Compl. ¶ 20.) (emphasis added).  Likewise, the Sub-Advisory

10

Agreements state that the "Adviser shall continue to have responsibility for all services to be

provided to each Fund pursuant to the Advisory Agreement and shall oversee and review the

sub-adviser's performance of its duties under this Agreement."  Sub-Advisory Agreement ¶ 2.

The Funds' public disclosures to shareholders also emphasize that SIMC bears full

responsibility for the Funds' performance, stating in bold text:

> **SIMC has the ultimate responsibility for the investment performance of the Funds due to its responsibility to oversee sub-advisers and recommend their hiring, termination, and replacement.**

*See, e.g.*, SIIT SAI (1/31/2013) at S-41 (emphasis in original).  The Funds reiterate this point by

disclosing that SIMC acts as a manager of managers and *"is responsible for the investment*

*performance of the Funds* since it allocates the Funds' assets to one or more Sub-Advisers and

recommends hiring or changing sub-advisers to the Board of Trustees."  *See*, *e.g.*, SIMT

Prospectus (1/31/2013) at 113 (emphasis added).

### E.    SIMC's Disclosures Show That SIMC Performs A Huge Amount Of Work

As a registered investment adviser, SIMC is required to disclose to the SEC information

regarding its business and the work it performs with respect to the management of the SEI funds.

Those disclosures describe how SIMC selects and continually monitors and evaluates the sub-

advisers.

#### 1.    SIMC's Sub-Adviser Selection Process

SIMC devotes significant resources to performing due diligence on potential sub-advisers

and selecting a combination of sub-advisers that SIMC believes has the best chance of helping

each Fund reach its investment goals.  Using proprietary databases and software, SIMC performs

quantitative and qualitative analyses of potential sub-advisers.  *See* Form ADV Mutual Fund

Implementation Wrap Brochure (4/1/2013) at 14.  The quantitative analysis identifies the sources

of a manager's return relative to a benchmark, while the qualitative analysis focuses on a

manager's investment process and personnel.  *See id*.  SIMC then constructs portfolios that are diversified across various sources of return and risk by selecting sub-advisers with different investment styles and processes and allocating the fund's assets among them.  *See id*; SIIT SAI (1/31/2013) at S-41.

SIMC selects and oversees numerous sub-advisers "with differing investment philosophies" to manage portions of the Funds' assets.  *E.g.*, SIIT SAI (1/31/2013) at S-1. Specifically, as of late 2012 or early 2013, SIMC employed:  (1) *seven* different sub-advisers to manage portions of the International Equity Fund's portfolio; (2) *five* different sub-advisers to manage portions of the High Yield Bond Fund's portfolio; (3) *eight* different sub-advisors to manage portions of the Tax Managed Large Cap Fund; (4) *seven* sub-advisers with respect to the Tax-Managed Small/Mid Cap Fund; and (5) *two* sub-advisers with respect to the Intermediate-Term Municipal Fund.  *See id*. at S-42-44; SIMT SAI (1/31/2013) at S-62-66; STET SAI (12/31/2012) S-30.

2.    SIMC Continuously Monitors the Sub-Advisers And Reallocates Assets

SIMC continually monitors each sub-adviser's compliance with the Fund's investment policies and guidelines.  *See, e.g.*, SIIT SAI (1/31/2013) at S-41.  Additionally, SIMC closely tracks each sub-adviser's performance and risk, as well as events relating to the sub-advisory firm, the investment team, and market trends.  *See* Form ADV Mutual Fund Implementation Wrap Brochure (4/1/2013) at 12, 15.  When SIMC determines that a sub-adviser has lost its competitive advantage or deviated from SIMC's expectations, SIMC takes steps to realign the management of the Fund by reducing the sub-adviser's allocation within the portfolio or, as discussed below, by recommending that the Board of Trustees terminate the sub-adviser.  *See, e.g.*, SIIT SAI (1/31/2013) at S-41; Form ADV Mutual Fund Implementation Wrap Brochure

(4/1/2013) at 12.  Similarly, SIMC may increase a sub-adviser's allocation of assets if SIMC believes that doing so will help the Fund achieve its investment goals.  *See id*.

3.   In An Effort to Improve Performance, SIMC Added or Changed Sub-Advisers Frequently

SIMC's continuous review of potential new sub-advisers and monitoring and re-evaluation of current sub-advisers has resulted in frequent recommendations to the Board of Trustees to retain or remove sub-advisers or to retain additional sub-advisers.  For example, in the last five years, nine sub-advisers were terminated and nine sub-advisers were added for the International Equity Fund alone.  *See* SIIT Annual Report (9/30/2009) at 1; SIIT Annual Report (9/30/2010) at 1; SIIT Annual Report (9/30/2011) at 1; SIIT Annual Report (9/30/2012) at 1. During that period, seven sub-advisers were terminated and five added for the Tax-Managed Large Cap Fund and six sub-advisers were terminated and five added for the Tax-Managed Small/Mid Cap Fund.  *See* SIMT Annual Report (9/30/2009) at 5, 15; SIMT Annual Report (9/30/2010) at 4, 9; SIMT Annual Report (9/30/2011) at 4, 9; SIMT Annual Report (9/30/2012) at 4, 10; SIMT Annual Report (9/30/2013) at 10.  One sub-adviser was terminated and two additional sub-advisers were hired for the High Yield Bond Fund.  *See* SIMT Annual Report (9/30/2009) at 33.  *See* Exhibit A (detailing the changes in sub-advisers).

**F.   Compensation of SIMC and Sub-Advisers**

In exchange for the services SIMC provides to the Funds, each Fund pays SIMC an advisory fee, calculated as a percentage of the Fund's average daily net assets and specified in the Advisory Agreement.  SIMC frequently agrees to waive a portion of its fee in order to keep each Fund's total direct annual operating expenses at a specified level.  *See, e.g.*, SIIT SAI (1/31/2013) at S-89.  In the Funds' fiscal year 2012 -- the only year at issue in Plaintiffs'

complaint -- SIMC waived a total of $2,655,000 in fees to the Funds.  *See* SIIT Annual Report (9/30/2012) at 33; SIMT Annual Report (9/30/2012) at 197, 199; STET Annual Report (8/31/2012) at 86.

SIMC pays the sub-advisers out of the investment advisory fees it receives.  *See, e.g.*, SIIT SAI (1/31/2013) at S-41.  As demonstrated by the chart below[9] and admitted in the Complaint (Compl. ¶ 26.), the lion's share of the advisory fees that SIMC receives from the Funds is used to pay the sub-advisory fees.  Of the total advisory fees that the Funds paid, SIMC retained only 37%, while the sub-advisers were paid 63%.

|  | Total Advisory Fee | Sub-Advisory Fees Paid by SIMC | Advisory Fees Retained by SIMC | Percentage of Advisory Fee to sub-advisers | Percentage of Advisory Fee Retained by SIMC |
|---|---|---|---|---|---|
| **International Equity Fund** | $8,759,000 | $5,925,000 | $2,834,000 | 68% | 32% |
| **High Yield Bond Fund** | $7,253,000 | $4,729,000 | $2,524,000 | 65% | 35% |
| **Tax-Managed Large Cap Fund** | $6,162,000 | $3,527,000 | $2,635,000 | 57% | 43% |
| **Tax-Managed Small/Mid Cap Fund** | $1,647,000 | $1,178,000 | $469,000 | 72% | 28% |

---

[9]  The figures in the chart are found in the SAIs and Annual Reports.  *See* SIIT SAI (1/31/2013) at S-42; SIMT SAI (1/31/2013) at S-61-62; STET SAI (12/31/2012) at S-31; SIIT Annual Report (9/30/2012) at 33; SIMT Annual Report (9/30/2012) at 197, 199; STET Annual Report (8/31/2012) at 86.  Except as noted *infra* in footnote 10, these figures are consistent with those used in the Complaint. (Compl. ¶ 26.).

| Intermediate-Term Municipal Fund | $2,697,000[10] | $1,256,000 | $1,441,000 | 47% | 53% |
|---|---|---|---|---|---|
| **TOTAL** | $26,518,000 | $16,615,000 | $9,903,000 | **63%** | **37%** |

## III.    BOARD APPROVAL OF ADVISORY AGREEMENT AND ADVISORY FEES

### A.    Overview of Regulatory Scheme

The ICA requires at least 40 percent of a mutual fund's board members to be independent (sometimes called "disinterested"). 15 U.S.C. § 80a-10(a). To be independent, a fund trustee generally may not: (1) be affiliated with, or have a family member who is affiliated with, the fund, its investment adviser, or its principal underwriter; (2) during the past six months, have executed trades with, distributed shares of, or loaned money to, the fund, any affiliated fund, or its investment adviser; and (3) during the past two years, have acted as legal counsel to the fund or have otherwise had a "material business or professional relationship" with the fund or any affiliated funds. *See* 15 U.S.C. § 80a-2(a)(19).

Under the ICA, an advisory agreement must precisely describe all compensation to be paid to the adviser and allow for termination by the board at any time without payment of any penalty. *See* 15 U.S.C. § 80a-15(a). Additionally, the advisory agreement must be approved initially and then at least annually by a majority of the fund's board, including a majority of the independent trustees, cast in person at a meeting called for that purpose. *See* 15 U.S.C. § 80a-15(c).

---

[10]    Plaintiffs assert that the Intermediate-Term Municipal Fund paid $3,164,000 in fees, net of waivers, in fiscal year 2012. (Compl. ¶ 26.) However, this figure fails to take into account the $467,000 waived by SIMC. *See* STET Annual Report (8/31/2012) at 86.

B.     **The SEI Funds' Board of Trustees and the Advisory Agreement Approval Process**

1.     The Board of Trustees

The Trusts and their portfolios, including the SEI Funds, are overseen by a Board of Trustees.  The Board is responsible for overseeing the Trusts' service providers, including SIMC. Pursuant to the ICA, the Board meets annually to review SIMC's services and consider whether to renew the Advisory Agreements between SIMC and the Trusts.  *See, e.g.*, SIIT SAI (1/31/2013) at S-74.  The Board is composed of seven trustees, five of whom are independent (the "Independent Trustees").[11]  Morgan, Lewis & Bockius LLP serves as counsel to the Trusts. *Id*. at S-94.  In addition, the Independent Trustees have their own, separate independent counsel - - Bingham McCutchen LLP.  *See* SIIT Annual Report (9/30/2012) at 52 ("[T]he Independent Trustees receive advice from independent counsel to the Independent Trustees . . . .").

2.     The Independent Trustees

Plaintiffs do not allege that any of the Independent Trustees were not independent as defined in the ICA.  Moreover, Fund disclosures make plain that the Independent Trustees are highly qualified and have a wealth of experience in the mutual fund and asset management fields.

- George J. Sullivan Jr. serves as Lead Independent Trustee.  Mr. Sullivan has served on the Board since 1996 when he was elected by the Funds' shareholders.  Mr. Sullivan, a certified public accountant, is currently retired.  Before his retirement, Mr. Sullivan was a self-employed financial consultant.  Prior to that, he served as Treasurer of Peak Asset Management, Inc., a registered investment advisory firm, Chief Financial Officer of hedge fund Nobel Partners, L.P., and General Partner of hedge fund Teton Partners, L.P.  *See* SIIT SAI (1/31/2013) at S-75-77; Proxy Statement (6/24/1996) at 6-8.

---

[11]     The Complaint includes a sixth independent trustee, Rosemarie B. Greco (Compl. ¶ 36), who resigned as of March 29, 2013.  *See* STET SAI (12/31/2013) at S-55.

- Nina Lesavoy was appointed to the Board by the Board of Trustees in 2003 and was elected by the Funds' shareholders in 2004. Ms. Lesavoy is a Managing Director and the Founder of Avec Capital, a private equity firm. Ms. Lesavoy was previously a Managing Director of private equity firm Cue Capital and Head of Sales and Client Services at asset management firm Chancellor Capital. *See* SIIT SAI (1/31/2013) at S-76-77; Proxy Statement (9/9/2004) at 4-6.

- James M. Williams has served on the Board since 2004, when he was elected by the Funds' shareholders. Mr. Williams has been a Vice President and the Chief Investment Officer of J. Paul Getty Trust, Non-Profit Foundation for Visual Arts since 2002. Before that, Mr. Williams served as President of Harbor Mutual Funds, a registered investment company, and Harbor Capital Advisors, an investment management firm. Earlier in his career, Mr. Williams was the Manager of the pension assets of Ford Motor Company. *See id*.

- Mitchell A. Johnson has served on the Board since 2007. Mr. Johnson has been a private investor since 1994. Before that, Mr. Johnson was a Senior Vice President of Corporate Finance at Student Loan Marketing Association (Sallie Mae). Mr. Johnson also serves as a director of Federal Agricultural Mortgage Corporation (Farmer Mac) and several other mutual funds. *See* SIIT SAI (1/31/2013) at S-76-77; Federal Agricultural Mortgage Corp. Proxy Statement, Form DEF 14A (4/26/2013) at 8.

- Hubert L. Harris, Jr. has served on the Board since 2008. Before retiring in 2005, Mr. Harris was the Chief Executive Officer and Chairman of the Board of Directors of AMVESCAP Retirement, Inc, an investment management firm. Prior to that, Mr. Harris was the Chief Executive Officer of another investment firm, INVESCO North America. Mr. Harris was formerly a member of the Board of Directors of AMVESCAP PLC, and a member of the Board of Trustees of Georgia Tech Foundation, Inc., of which he is currently an emeritus trustee. Mr. Harris is also currently a member of the Board of Directors of Aaron's Inc. and the Board of Councilors of the Carter Center, a nonprofit corporation. *See* SIIT SAI (1/31/2013) at S-76-77.

        3.    <u>Advisory Agreement Approval Process</u>

Throughout the year,[12] the Trustees receive extensive information about the Funds,

including written information regarding:

- The quality of SIMC's and the sub-advisers' investment management and other services

---

[12]    The Board and its committees meet periodically throughout the year. For instance, in fiscal year 2012, the Audit Committee met four times and the Governance Committee met 3 times. *See* SIIT SAI (1/31/2013) at S-78-79.

- SIMC's and the sub-advisers' investment management personnel

- SIMC's and the sub-advisers' operations and financial condition

- SIMC's and the sub-advisers' brokerage practices and investment strategies

- SIMC's and the sub-advisers' compliance systems

- SIMC's and the sub-advisers' policies on and compliance procedures for personal securities transactions

- SIMC's and the sub-advisers' reputation, expertise and resources in domestic and/or international financial markets

- The Funds' performance compared with similar mutual funds

*See, e.g.*, SIIT Annual Report (9/30/2012) at 52.

Moreover, consistent with its obligations under the ICA, the Board calls and holds an annual meeting dedicated to considering whether to renew the Advisory Agreements between the Trusts and SIMC.[13]  In connection with this meeting, the Board requests and receives additional information.  For instance, in connection with the 2012 meeting, the Board received information about SIMC's affiliates, personnel, and operations.  *See, e.g.*, SIIT Annual Report (9/30/2012) at 52.  The Board also received information regarding the level of advisory fees that SIMC charges the Funds compared with the fees it charges to comparable mutual funds, as well as the level of SIMC's profitability from Fund-related operations.  *See id*.  Moreover, third parties provided the Board with extensive data regarding SIMC's performance and fees, including information regarding the Funds' overall fees and operating expenses, compared with similar mutual funds. *See id*.  The Board also reviewed a memorandum from Fund counsel and independent counsel to the Independent Trustees regarding the responsibilities of the Trustees in connection with their

---

[13]    The Board also holds annual meetings to review the sub-advisory agreements.  In fiscal year 2012, the Board held such meetings in March, June, and September.  *See* SIIT Annual Report (9/30/2012) at 53; SIMT Annual (9/30/2012) at 247; STET Annual Report (8/31/2012) at 109.

consideration of whether to approve the Advisory Agreements.  *See id*.  In addition, the Independent Trustees received advice from independent counsel regarding the proposed approval of the Advisory Agreements, met in executive sessions outside the presence of Fund management to discuss the agreements, and participated in question and answer sessions with representatives of SIMC and the sub-advisers.  *See id*.

During its meetings, the Board -- guided by Trust counsel and independent counsel to the Independent Trustees -- evaluated and reached conclusions regarding a number of factors, including the following:

1.   *The nature, extent, and quality of the services provided the Funds*.  The Trustees evaluated SIMC's and the sub-advisers' personnel, experience, track record, and compliance program.  The Board found the nature, extent and quality of services provided by SIMC to be satisfactory.  *See id*. at 53.

2.   *Fund Performance*.  The Board considered the Funds' performance relative to their peer groups and appropriate indices and/or benchmarks in light of total return, yield, and market trends.  As part of this review, the Trustees took into account the composition and selection criteria of each peer group.  The Trustees found Fund performance satisfactory and, where performance was below the benchmark, the Trustees were satisfied that SIMC was taking appropriate steps to improve performance.  *See id*.

3.   *Fund Expenses*.  The Board also considered the Funds' expenses, including the advisory fees specified in the Advisory Agreements, the Funds' overall expenses (the "net operating expense ratio") in comparison to those of comparable mutual funds, and information about average expense ratios of comparable mutual funds in the Funds' respective peer groups.  The Trustees also took into account the effects of SIMC's voluntary waiver of advisory fees to

prevent total Fund expenses from exceeding a specified cap.  The Trustees concluded that the advisory fees SIMC charged the Funds were either below average or that there was a reasonable basis for the fee level.  The Trustees further concluded that, particularly given SIMC's fee waivers, the Funds' net operating expenses were reasonable.  *See id*.

4.    *Profitability*.  The Trustees additionally considered the profitability of the Advisory Agreements to SIMC, taking into account all compensation flowing to SIMC, both directly and indirectly.  The Trustees considered whether the levels of compensation and profitability under the Agreements were reasonable and justified in light of the quality of all services rendered to the Funds by SIMC.  *See id*. at 54.

5.    *Economies of Scale*.  Finally, the Trustees considered the existence of any economies of scale and, if such economies of scale existed, whether they were passed along to the Funds' shareholders through a graduated advisory fee schedule or other means, including fee waivers.  *See id*.

After considering and discussing each of the foregoing factors, the Trustees concluded that the compensation under the Advisory Agreement and Sub-Advisory Agreements was fair and reasonable in light of the services provided to the Funds.  *See id*.  The Board of Trustees, including the Independent Trustees, thereafter unanimously approved the continuation of the Advisory and Sub-Advisory Agreements.  *See id*.

## ARGUMENT

Plaintiffs assert that SIMC has violated Section 36(b) of the ICA.  But, they do not offer the Court any factual basis for concluding that the fees were too high.  They fail to make a single allegation comparing SIMC's fees to competitors' fees or explaining why the extensive services provided by SIMC did not warrant its retention of a minority of the advisory fees.  Plaintiffs

allege that SIMC did "almost no work" -- but this allegation is demonstrably false, as is evident from the face of the Complaint itself and the publicly available documents which underlie Plaintiffs' allegations.  In light of the demanding standard applicable to Plaintiffs' Complaint, Plaintiffs have failed to meet their burden of alleging specific facts sufficient to set aside the business judgment of the Independent Trustees.

**I.** **UNDER THE RELEVANT PLEADING STANDARD, THE COURT MUST ASSESS THE *FACTS* ALLEGED AND DISMISS THE COMPLAINT IF THOSE FACTS FAIL TO SUPPORT A PLAUSIBLE CLAIM FOR RELIEF**

Recent Supreme Court precedent has shifted pleading standards "from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the conduct alleged." *Id.*

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not entitled to a presumption of truth.  *Id*.  In particular, conclusory statements should be disregarded when they are contrary to the plaintiff's own factual allegations or to documents relied upon by the plaintiff.  *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 n.8 (3d Cir. 1994); *In re Walnut Leasing Co.*, No. 99-526, 1999 WL 729267, at *4 n.9 (E.D. Pa. Sept. 8, 1999).

## II.   *JONES* IMPOSES A DEMANDING STANDARD ON PLAINTIFFS SEEKING TO SECOND-GUESS THE INDEPENDENT TRUSTEES' JUDGMENT REGARDING MUTUAL FUND FEES

Section 36(b) of the ICA imposes a fiduciary duty on investment advisers "with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser." 15 U.S.C.A. § 80a-35(b).  Under Section 36(b), shareholders are able to bring suit to enforce this fiduciary duty, subject to several significant limitations.  *See id.* § 80a-35(b). For instance, rather than imposing on the adviser the burden of proof with respect to its receipt of fees, "the plaintiff shall have the burden of proving a breach of fiduciary duty."  *Id.* (1).

In adopting Section 36(b), Congress reached a "delicate compromise."  *See Jones*, 559 U.S. at 340.  The SEC initially requested that it be empowered to bring an action to challenge whether a fee was "reasonable."  Opponents of this proposal were concerned that a reasonableness standard would "in essence provide the Commission with rate-making authority." *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 538 (1984).  Accordingly, Congress struck a balance by providing shareholders with a new private right of action but *rejecting* a review of advisory fees for reasonableness.  *See Jones*, 559 U.S. at 341.

In *Jones v. Harris Associates*, the Supreme Court settled the question of the proper standard under Section 36(b).  In *Jones*, the Supreme Court adopted the "basic formulation" set forth by the Second Circuit in *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923 (2d Cir. 1982), which established that a breach of fiduciary duty only occurs where "an investment adviser [receives] a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining."  *Jones*, 559 U.S. at 345-46.  Courts have recognized that this *Gartenberg* standard

establishes "a very high hurdle to overcome."  *See e.g.*, *In re Am. Mut. Funds Fee Litig.*, No. 04-5593, 2009 WL 5215755, at *3 (C.D. Cal. Dec. 28, 2009).[14]

    The demanding *Jones/Gartenberg* standard reflects Congressional intent, set forth in the ICA, that mutual fund boards be primarily responsible for the protection of mutual fund investors.  *See e.g., Burks v. Lasker*, 441 U.S. 471, 484 (1979) ("Congress' purpose in structuring the [ICA] as it did is clear.  It 'was designed to place the unaffiliated directors in the role of independent watchdogs . . . who would furnish an independent check upon the management of investment companies.'" (quotation marks and citation omitted)).  As the Supreme Court has explained: "Congress entrusted to the independent directors of investment companies, exercising the authority granted to them by state law, the primary responsibility for looking after the interests of the funds' shareholders."  *Id*. at 484-85.  In *Jones*, the Supreme Court elaborated further that:

> [w]here a board's process for negotiating and reviewing investment-adviser compensation is robust, a reviewing court should afford commensurate deference to the outcome of the bargaining process.  Thus, if the disinterested directors considered the relevant factors, *their decision to approve a particular fee agreement is entitled to considerable weight, even if a court might weigh the factors differently*.

*Jones*, 559 U.S. at 351 (emphasis added and citation removed).  Thus, "the standard for fiduciary breach under § 36(b) does not call for judicial second-guessing of informed board decisions."  *Id*. at 352.  Accordingly, courts routinely grant motions to dismiss Section 36(b) claims.[15]

---

[14]    As discussed more fully below, when assessing whether a plaintiff has stated a claim under Section 36(b), courts typically evaluate the so-called "*Gartenberg* factors" including the independence and conscientiousness of the board in evaluating adviser compensation.  "[T]he [ICA] instructs courts to give board approval of an adviser's compensation 'such consideration . . . as is deemed appropriate under all the circumstances."  *Jones*, 559 U.S. at 348 citing 15 U.S.C.A. § 80a-35(b)(2).  In *Jones*, the Supreme Court made clear that trustee approval should be given "considerable weight," where, as here, the independence of the independent trustees, and the board process, have not been called into question.

III.   **PLAINTIFFS FAIL TO ALLEGE FACTS CALLING INTO QUESTION THE INDEPENDENCE OR THOROUGHNESS OF THE INDEPENDENT TRUSTEES**

Plaintiffs make no allegations calling into question the independence of the Independent Trustees or the thoroughness of the Board process.  Accordingly, the business judgment of the Independent Trustees with respect to SIMC's fees is entitled to "considerable weight."

A.   **Plaintiffs Fail To Allege Facts Showing That The Independent Trustees Were Not Independent**

Under the ICA, the Independent Trustees are ***presumed*** to be independent.  15 U.S.C. §80a-2(a)(9).  "Only by alleging facts that, if proved, would render the directors interested will plaintiff be able to overcome that presumption."  *Krantz v. Prudential Invs. Fund Mgmt., LLC*, 305 F.3d 140 (3d Cir. 2002).  Here, Plaintiffs' only allegations challenging independence are that the Trustees oversee numerous funds in the SEI complex and receive compensation for their service.  (Compl. ¶¶ 36, 38.)  These allegations fail as a matter of law.  Indeed, if these allegations were sufficient, then the independence of trustees for nearly every major fund family in the country would be negated.

---

15   *See, e.g.*, *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 528 F. Supp. 2d 332, 337-38 (S.D.N.Y. 2007) *aff'd in part, vacated in part sub nom. The R.W. Grand Lodge of F. & A.M. of Pennsylvania v. Salomon Bros. All Cap Value Fund*, 425 F. App'x 25 (2d Cir. 2011); *Mintz v. Baron*, No. 05CIV.4904(LTS)(HBP), 2009 WL 735140 (S.D.N.Y. Mar. 20, 2009); *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 527 (S.D.N.Y. 2008); *Alexander v. Allianz Dresdner Asset Mgmt. of Am. Holding, Inc.*, 509 F. Supp. 2d 190, 196 (D. Conn. 2007); *In re Scudder Mut. Funds Fee Litig.*, No. 04 CIV. 1921 (DAB), 2007 WL 2325862 (S.D.N.Y. Aug. 14, 2007); *In re Goldman Sachs Mut. Funds*, No. 04 CIV. 2567 (NRB), 2006 WL 126772 (S.D.N.Y. Jan. 17, 2006); *Yampolsky v. Morgan Stanley Inv. Advisers Inc.*, No. 03 CIV. 5710 (RO), 2004 WL 1065533 (S.D.N.Y. May 12, 2004) *aff'd sub nom. Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338 (2d Cir. 2006); *Hamilton v. Allen*, 396 F. Supp. 2d 545, 557-58 (E.D. Pa. 2005); *Benak ex rel. the Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P.*, No. CIV.A. 01-5734, 2004 WL 1459249 (D.N.J. Feb. 9, 2004); *Strougo v. BEA Assocs.*, 188 F. Supp. 2d 373, 384 (S.D.N.Y. 2002); *Migdal v. Rowe Price-Fleming Int'l, Inc.*, No. AMD 98-2162, 2000 WL 350400 (D. Md. Mar. 20, 2000) *aff'd*, 248 F.3d 321 (4th Cir. 2001).

In *Krantz*, plaintiffs -- like Plaintiffs here -- alleged that "none of the members of the Fund's board are independent. . . because they serve on numerous other boards for various Prudential funds and receive a large aggregate compensation for their combined services." 305 F.3d at 142. In affirming the dismissal of the complaint, the Third Circuit held that plaintiffs' allegations were insufficient as a matter of law. The Court explained:

> [N]either the ICA nor the SEC proscribes the use of multi-board membership within mutual fund complexes. In fact, as noted, membership on the boards of several funds within a mutual fund complex is the prevailing practice within the industry. . . Indeed, the SEC has recently reaffirmed its position that a director of a fund who is also a director of another fund managed by the same adviser generally would not be viewed as an interested person of the fund under section 2(a)(9) solely as a result of this relationship.

*Id*. 305 F.3d at 143-44 (citations and quotation marks omitted). *See also Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 345 (2d Cir. 2006) (allegations that directors received compensation in excess of $150,000 plus retirement benefits and serve on the boards of many mutual funds "are insufficient as a matter of law" to establish lack of independence); *Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 329-330 (4th Cir. 2001) (allegations that directors served on boards of many related funds and received compensation were insufficient as a matter of law to establish lack of independence); *Strougo v. BEA Assocs.*, 188 F.Supp. 2d 373, 382 (S.D.N.Y. 2002) (service on multiple boards does not constitute a lack of independence).

**B.    Plaintiffs Fail To Allege Facts Showing That The Board Process Was Deficient**

Plaintiffs fail to plead any facts plausibly suggesting that the Board's process was anything other than thorough and robust. Rather, Plaintiffs merely deploy the circular argument that the process must have been infirm because, after all, the Trustees approved the Advisory Agreement and Sub-Advisory Agreements. In service of that assertion, they make the same sort of allegations that have been routinely rejected in other cases.

For instance, Plaintiffs allege that the Trustees "cannot properly monitor the SEI Funds" because they oversee numerous funds within the SEI Funds complex, each of which has a lengthy prospectus, regulatory filings, and compliance issues to review.  (Compl. ¶ 38.)  This allegation is insufficient as a matter of law.  *See Migdal*, 248 F.3d at 330-31 (rejecting allegation that "because of their obligations to so many funds, the directors could not spend enough time on each particular fund" as insufficient as a matter of law); *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 528 F. Supp. 2d 332, 337-38 (S.D.N.Y. 2007) (allegation that "it was unlikely that the Directors could devote the amount of time to oversee the many portfolios on their watch" was insufficient as a matter of law) *aff'd in part, vacated in part sub nom. The R.W. Grand Lodge of F. & A.M. of Pennsylvania v. Salomon Bros. All Cap Value Fund*, 425 F. App'x 25 (2d Cir. 2011).

Plaintiffs next assert that the Board could not have been acting conscientiously when it approved SIMC's advisory fees because the Funds "underperform[ed] their primary benchmarks" for certain periods.  (Compl. ¶ 41.).  This assertion, too, is unavailing.  As an initial matter, this allegation proves far too much because, if accepted, it would mean that trustees for every fund below the benchmark are not acting conscientiously.  In addition, a fund's advisory fee is not excessive -- and a Board process is not deficient -- simply because the fund underperformed a benchmark.  *See, e.g.*, *In re Salomon Smith Barney Mut. Fund*, 528 F. Supp. 2d at 337-38 (refusing to "extrapolate deficient service from allegedly sub-standard investment returns"); *Amron*, 464 F.3d at 344 (allegations that a fund "lost money" do not state a Section 36(b) claim because "allegations of underperformance alone are insufficient to prove that an investment adviser's fees are excessive") (quoting *Migdal*, 248 F.3d at 327).

In a last-ditch effort to impugn the Board's process, Plaintiffs argue that the Board would not have approved the Advisory Agreements "if they had obtained adequate information regarding, among other things: (i) the services provided by the sub-advisers, and the fees the sub-advisers charged for such services, as compared to the investment management fees that defendant SIMC charged for its minimal services; (ii) the economies of scale enjoyed by defendant SIMC: and (iii) the profitability of the SEI Funds to defendant SIMC."  (Compl. ¶ 40.) This allegation is also deficient.

As an initial matter, this allegation is totally conclusory and circular.  In essence, Plaintiffs work backwards -- they claim that, because the fees were allegedly excessive, the Board process must have been flawed.  But if this allegation suffices, then every plaintiff could call into question the *process* of every board in the country by simply disagreeing with the board's ultimate *conclusion*.  As such, investors could question a board's process without alleging a single fact about the independence of the board, the materials the board reviewed, or the expertise of the board members.  Such a result would be completely at odds with the statutory scheme, which both gives significant deference to the board and is designed to protect advisers from ill-founded suits.  *See In re Franklin Mut. Funds Fee Litig.*, 478 F. Supp. 2d 677, 687 (D.N.J. 2007) (allowing plaintiffs to state a Section 36(b) claim based on allegations that could apply to a significant portion of mutual fund complexes would "violate a stated intent of the drafters of the 1970 amendments [to the ICA], which was to 'prevent the harassment of investment advisors by ill-founded or nuisance law suits, the so-called strike suit.'") (quoting H.R. Rep. 1392, 91st Cong., 2d Sess., 8 (1970)).

Moreover, although confusingly crafted, the allegation actually contains no allegations of fact.  It does not, for instance, identify any information that the Board did not, in fact, receive.

Rather, it alleges that the Board did not receive "adequate" information -- whatever that means -- because the Board approved of the Advisory Agreements.  Even more troubling, Plaintiffs' insinuation is contrary to the Funds' publicly-filed documents, which describe in detail the type of information that the Board reviewed when considering approval of the Advisory and Sub-Advisory Agreements, including:

- The quality of SIMC's and sub-advisers' investment management and other services

- SIMC's and the sub-advisers' investment management personnel

- SIMC's and the sub-advisers' operations and financial condition

- SIMC's and the sub-advisers' brokerage practices and investment strategies

- The level of advisory fees that SIMC and the sub-advisers charge the Funds compared with the fees each charge to comparable mutual funds

- The Funds' overall fees and operating expenses compared with similar mutual funds

- The level of SIMC's and the sub-advisers' profitability from their Fund-related operations

- SIMC's and the sub-advisers' compliance systems

- The level of SIMC's and the sub-advisers' policies on and compliance procedures for personal securities transactions

- SIMC's and the sub-advisers' reputation, expertise and resources in domestic and/or international financial markets

- The Funds' performance compared with similar mutual funds[16]

* * *

In sum, Plaintiffs' allegations regarding the Board are devoid of facts, contrary to the public documents, and circular.  As such, they fail to call into question the independence of the Independent Trustees or the process the Board followed.  Therefore, "considerable weight"

---

[16] *See* SIIT Annual Report (9/30/2012) at 52.

should be given to the Independent Trustees' business judgment approving of the Funds' fee arrangements with SIMC.

## IV.   PLAINTIFFS' PLEADING FAILS TO STATE A CLAIM UNDER THE SUPREME COURT'S STANDARD

To state a claim sufficient to overcome the deference owed to the Independent Trustees, Plaintiffs must plead facts showing that the adviser's fee "is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining."  In evaluating whether the Plaintiffs have met this heavy burden, the Court should consider -- in addition to the independence and conscientiousness of the board -- the following "*Gartenberg* factors":

(1)    The adviser-manager's cost in providing the service;

(2)    The extent to which the adviser-manager realizes the economies of scale as the fund grows larger;

(3)    The volume of orders which must be processed by the manager;

(4)    The nature and quality of the services provided to the fund and shareholders;

(5)    The profitability of the fund to the adviser;

(6)    Any 'fall-out financial benefits,' those collateral benefits that accrue to the adviser because of its relationship with the mutual fund; and

(7)    Comparative fee structures (meaning a comparison of the fees with those paid by similar funds)

*Jones*, 559 U.S. at 344 & n.5.  A review of these factors demonstrates that Plaintiffs have not -- and cannot -- overcome the deference owed to the Independent Trustees.

### A.    Plaintiffs Fail To Allege That The Nature and Quality Of The Services Provided By SIMC Did Not Warrant SIMC's Compensation

Plaintiffs' allegations regarding the services provided by SIMC can be summarized simply.  Plaintiffs make no allegations about the *quality* of the services provided by SIMC. Rather, they make only a claim about the *quantity* of service provided, *i.e.* SIMC provided

essentially no services according to Plaintiffs, but nevertheless retained 37% of the total advisory

fees in 2012.  These allegations are deficient because:  (1) Plaintiffs' conclusory allegations

regarding the level of services performed by SIMC are not only unsupported by any factual

allegations in the Complaint, but are also contrary to their own admissions and the documents

upon which they rely; and (2) Plaintiffs provide no basis whatsoever from which the Court could

conclude that the retention of 37% of the fees, given the scope and quality of the service

provided by SIMC, is excessive.  For these reasons, Plaintiffs' allegations regarding the services

provided fail to support their Section 36(b) claim.

     1.    <u>Plaintiffs' Allegations That SIMC Performs "Almost No Work" Are<br>Contrary To Plaintiffs' Own Admissions</u>

In their Complaint, Plaintiffs base their claim on allegations that SIMC's "responsibilities

are minimal" (Compl. ¶ 27.) and that SIMC performs "almost no work" (Compl. ¶ 25.).  The

Court should ignore these allegations because they are contrary to Plaintiffs' own admissions.

*See, e.g.*, *In re Walnut Leasing Co.*, 1999 WL 729267, at *4 n.9 ("General, conclusory

allegations need not be credited . . . when they are belied by more specific allegations of the

complaint.") (citation omitted); *Sowemimo v. Thomas*, No. CIV.A. 09-639, 2009 WL 3806737, at

*3 (W.D. Pa. Nov. 13, 2009) (*quoting* 5A Charles A. Wright & Arthur R. Miller, Federal

Practice and Procedure § 1363, at 464-65 (2d ed. 1990)) ("The court will not accept as true

allegations that are contradicted by facts that can be judicially noticed or by other allegations or

exhibits attached to or incorporated in the pleading.").

Plaintiffs admit that SIMC performs numerous, important services for the Funds.

(Compl. ¶¶ 20-24, 27.)  As noted in the Complaint, SIMC and the Trusts entered into Advisory

Agreements which "task defendant SIMC with managing the investment and reinvestment of the

SEI Funds' assets" and require SIMC to fulfill a host of responsibilities, specified *supra*, Section

II.B.  (Compl. ¶ 20.)  Likewise, Plaintiffs admit that SIMC selects "numerous sub-advisers" (Compl. ¶ 21.) -- *two* for the Intermediate-Term Municipal Fund, *five* for the High Yield Fund, *seven* for the International Equity Fund, *seven* for the Tax-Managed Small/Mid Cap Fund, and *eight* for the Tax-Managed Large Cap Fund (Compl. ¶ 22.).  They also admit that SIMC is responsible for "assigning, overseeing, and evaluating the assets managed by the sub-advisers" (Compl. ¶ 27.) and "general oversight and supervising the sub-advisers" (Compl. ¶ 23.). Significantly, Plaintiffs nowhere allege any facts suggesting that the selection and supervision of numerous sub-advisers is not time-intensive work; nor do they allege that the other tasks covered by the Advisory Agreement -- such as the "continuous[]" review, supervision and administration of the Funds' investment programs (Compl. ¶ 20.) -- does not require a large team of individuals or a large expenditure of resources.  Thus, Plaintiffs' unsupported conclusion that SIMC performs "almost no work" is contradicted by their own pleading and should be disregarded.

   2.   Plaintiffs' Allegations That SIMC Performs "Almost No Work" Are
        Contrary To Documents Upon Which Plaintiffs Rely

   Plaintiffs' allegations that SIMC performs "almost no work" are also flatly contradicted by the very documents upon which they rely.  For instance, Plaintiffs point to the Sub-Advisory Agreements, arguing that they obligate the sub-advisers to perform services that are "practically identical" to those set out in the Advisory Agreements (Compl. ¶ 21.), thus taking all but "minimal" responsibilities off SIMC's plate. (Compl. ¶ 27.)  But, the very documents Plaintiffs point to refute their allegations.  *See*, *e.g.*, *ALA, Inc.*, 29 F.3d at 859 n.8 ("Where there is a disparity between a written instrument annexed to a pleading and an allegation in the pleading based thereon, the written instrument will control.") (citation omitted); *Villari Brandes & Giannone, PC v. Wells Fargo Fin. Leasing, Inc.*, No. CIV.A. 13-297, 2013 WL 5468497, at *1 n.1 (E.D. Pa. Sept. 30, 2013) ("The Court accepts as true the well-pleaded allegations of the

Complaint; however, [w]here those allegations are contradicted by written exhibits that [plaintiff] attached to [its] ... [C]omplaint . . . the exhibits trump the allegations.") (citation omitted).

As an initial matter, the Advisory and Sub-Advisory Agreements explicitly contradict Plaintiffs' conclusion.  They provide that the "retention of a sub-adviser by [SIMC] shall *not* relieve [SIMC] of its responsibilities under this [Advisory] Agreement" and that "[SIMC] *shall continue to have responsibility for all services* to be provided to each Fund pursuant to the Advisory Agreement and shall oversee and review the sub-adviser's performance of its duties under this [Sub-Advisory] Agreement." (Compl. ¶ 20; Sub-Advisory Agreement ¶ 2.)

Moreover, the duties set out in the Advisory and Sub-Advisory Agreements are not "practically identical" -- in fact, the ***only*** overlapping service relates to the determination of what securities should be purchased or sold.  For example, nowhere in the Sub-Advisory Agreements that Plaintiffs rely upon (Compl. ¶ 21.) are the sub-advisers charged with:  (1) selecting sub-advisers to carry out the Funds' investment programs; (2) determining how to allocate the Funds' assets to each sub-adviser; (3) supervising the sub-advisers to ensure they further the Funds' investment programs; (4) providing the Funds' administrator, the Trust, and the Trustees with records and regular reports concerning SIMC's activities and discharge of its responsibilities; (5) determining whether to recommend the retention or termination of sub-advisers, or the addition of new sub-advisers.  These duties are SIMC's alone.

Only SIMC has overall responsibility for the performance of the Funds *as a whole*; the sub-advisers have the narrower task of managing the portion of a Fund's assets that SIMC allots to them.  Thus, it is SIMC -- alone -- that must ensure that the sub-advisers are not working at

cross purposes, collectively violating certain investment limitations, or otherwise running afoul of the various laws and regulations applicable to the Funds as a whole.

### 3. Plaintiffs' Allegation That the Board's Oversight Role Minimizes SIMC's Responsibilities Makes No Sense

In an attempt to minimize SIMC's services, Plaintiffs allege in Paragraph 24 of the Complaint that "SIMC shares its supervisory role with the Board, which further limits defendant SIMC's responsibilities." (Compl. ¶ 24.)  This assertion is vacuous.  While both SIMC and the Board of Trustees oversee the management and operations of the Funds, it is inherent in every fund structure that the adviser and the Board which supervises it have distinct roles.

Like boards of directors for operating companies, the Trust Boards do not have day-to-day oversight over the Funds.  Like all outside directors, the Independent Trustees do not devote full time to their service on the Trust Boards, and they do not receive daily updates or have any daily responsibilities.  SIMC, on the other hand, is responsible for continuously performing the various tasks described earlier in this brief.  Indeed, the very document that Plaintiffs cite in Paragraph 24 of the Complaint makes plain that "Like most mutual funds, the day-to-day business of the Trust, including the management of risk, is performed by third party service providers, such as SIMC" -- not by the Board.  STET SAI (12/31/2013) at S-49.  Thus, just as the existence of a board of directors for an operating company does not diminish the work performed by company management, Plaintiffs' allegations regarding the oversight role of the Trust boards does not diminish the extensive, day-to-day work performed by SIMC.[17]

---

[17]     Plaintiffs also allege that SIMC's services are somehow diminished because the Advisory Agreement contains a customary limitation of liability provision.  Such a provision is standard in the mutual fund industry, including in situations where sub-advisers are not used, *see e.g.,* 1 Clifford E. Kirsch, Mutual Funds and Exchange Traded Fund Regulation § 6 (3d ed. 2013) (characterizing an essentially identical liability limitation as "widely

4.    <u>Plaintiffs Do Not Allege That SIMC's Services Were Not Of High Quality</u>

While Plaintiffs maintain that SIMC's fees were too high, they do not even attempt to allege that the quality of SIMC's services was unsatisfactory.  For instance, the Complaint is devoid of allegations concerning the number of SIMC employees providing advisory functions, or the tenure, experience, and skill of the investment professionals that are employees of SIMC or the sub-advisers.  Plaintiffs also do not allege that SIMC neglected or otherwise poorly performed its duties to select, monitor, and replace sub-advisers.

Rather than alleging that the quality of services was somehow deficient, Plaintiffs allege that the "SEI Funds underperform[ed] their primary benchmarks."  (Compl. ¶ 41.)  However, as discussed above, underperformance does not show that an adviser's fees are excessive.  *See, e.g.*, *Migdal*, 248 F.3d at 327-28; *In re Salomon Smith Barney Mut. Fund*, 528 F. Supp. 2d at 337-38.  As the Court of Appeals for the Fourth Circuit stated, "[a]ccepting plaintiffs' invitation to permit discovery here because the funds underperformed would make it possible for other plaintiffs to state a claim in limitless actions filed under Section 36(b)."  *Migdal*, 248 F.3d at 328.

5.    <u>SIMC Retains Less Than Half Of The Total Advisory Fees Paid By The Funds and Plaintiffs Make No Allegations Covered by Section 36(b).</u>

Beyond making conclusory allegations regarding SIMC's services that are contradicted by their own admissions, Plaintiffs attempt to obscure the fact that *less than half of the total advisory fees paid by the Funds are retained by SIMC*, while more than half goes to the sub-advisers.  For instance, Plaintiffs complain about the "***material difference*** in the fees defendant SIMC charged the SEI Funds, and the fees defendant SIMC paid the sub-advisers. . . ." (Compl.

---

used"), and is permitted by law, 15 U.S.C. § 80a-17(i).  Thus, although the provision in the Advisory Agreement limits SIMC's liability to cases involving gross negligence or worse, the fact remains that SIMC -- not the sub-advisers -- retains ultimate responsibility and potential liability for injuries to the Fund.

¶ 26.) and assert that "the sub-advisers charge defendant SIMC fees that represent *just a fraction* of the total fees that defendant SIMC charges the SEI Funds" (Compl. ¶ 27.) (emphases added). These allegations are insufficient at best and misleading at worst.

While Plaintiffs are technically correct that there is a "material difference" in the fees retained by SIMC and the fees retained by the sub-advisers, it is the *sub-advisers, not SIMC*, that retain a majority of the fees.  Moreover, literally speaking, Plaintiffs are correct that the sub-advisers charge "a fraction" of the total advisory fees that the Funds pay SIMC -- but this "fraction" is greater than one-half.  Indeed, of the total advisory fees paid by the Funds in fiscal year 2012, Plaintiffs allege that SIMC retained just 38% while the sub-advisers retained 62%. (Compl. ¶ 26.)  (The actual amount of fees retained by SIMC is actually lower, because Plaintiffs ignore certain SIMC fee waivers.[18])  Thus, no matter how Plaintiffs twist and turn in an attempt to characterize the situation in a manner more favorable to them, their claim that the fees retained by SIMC are "excessive" is belied by their own Complaint and the publicly available documents on which their allegations depend.  The Complaint acknowledges, as it must, that SIMC takes far less than half of the fees, even though it shoulders an enormous burden.  Plaintiffs simply never attempt to explain how it is plausible, when considering these critical facts, to conclude that the bargain struck between SIMC and the Funds could not have been the consequence of "arm's length bargaining." [19]

---

[18]   Plaintiffs' figures fail to take into account SIMC's fee waiver for the Intermediate-Term Municipal Fund.  *See* STET Annual Report (8/31/2012) at 86 (showing financial statements with total advisory fees of $3,164,000 less fee waiver of $467,000).  Using the correct figures, SIMC retained 37% of the total fees and the sub-advisers retained 63%.

[19]   As discussed below, Plaintiffs' allegations regarding SIMC's services also fail because Plaintiffs make no allegations covered by Section 36(b)'s one year look-back.  *See* 15 U.S.C. § 80a-35(b)(3) (providing that "[n]o award of damages shall be recoverable for any period prior to one year before the action was instituted").

**B.    Plaintiffs Fail To Plead Any Facts Showing That Economies Of Scale Existed Or That Economies Of Scale Were Not Shared With Investors**

Plaintiffs fail to plead any facts showing that economies of scale existed with respect to SIMC's management of the SEI Funds.  Rather, Plaintiffs simply set forth the conclusory assertion that:  (1) "significant economies of scale exist"; and (2) the Funds have grown but the management fee percentage has remained constant.  (Compl. ¶ 30). [20]  These allegations are insufficient to meet Plaintiffs' pleading burden for at least two independent reasons.

**1.    Plaintiffs Plead No Facts Showing That Economies Of Scale Existed**

First, Plaintiffs do not allege facts showing that economies of scale actually exist.  They do not, for instance, allege facts showing that SIMC's costs per investor fell as the Funds grew in size.  In *In re Scudder Mut. Funds Fee Litig.*, No. 04 CIV. 1921 (DAB), 2007 WL 2325862 (S.D.N.Y. Aug. 14, 2007), the plaintiffs made the exact sort of allegation that Plaintiffs make here.  Specifically, they alleged that "the fees charged to the Scudder Funds stayed the same or increased, even though economies of scale were achieved by the Defendants."  Id. at *3.  The court held that the allegation was insufficient because plaintiffs had "merely presume[d] that economies of scale were achieved."  Id. at *16.  The court explained:  "Plaintiffs in prior cases have argued in substance that since a fund increased dramatically in size, economies of scale must have been achieved.  The courts reject this argument."  *Id*. (*quoting Kalish v. Franklin Advisers, Inc.*, 742 F.Supp. 1222, 1238 (S.D.N.Y. 1990)).  *See also Amron*, 464 F.3d at 345 (affirming dismissal of complaint where plaintiffs "point to the size of the . . . advisory fees, but

---

[20]    In the Complaint, Plaintiffs make allegations regarding economies of scale in the fund industry generally.  (Compl. ¶¶ 28, 29).  They allege, for instance, that the legislative history of Section 36(b) discussed economies of scale and that the SEC and the Governmental Accounting Office have recognized the existence of economies of scale in the mutual fund industry (Compl. ¶ 29.).  These allegations -- which discuss the fund industry generally but not SIMC specifically -- are inadequate.  *See, e.g.*, *Yampolsky*, 2004 WL 1065533, at *2.

make no allegations regarding the costs of performing fund transactions or the relationship between such costs and the number of transactions performed") (*citing Krinsk v. Fund Asset Mgmt., Inc.*, 785 F.2d 404, 411 (2d Cir. 1989)); *Hoffman v. UBS-AG*, 591 F.Supp. 2d 522, 540 (S.D.N.Y. 2008) (to sufficiently allege the existence of economies of scale, "Plaintiffs must make a substantive allegation regarding the actual transaction costs at issue and whether the costs per investor increased or decreased as the assets under management grew").

> ### 2.   Plaintiffs Plead No Facts Showing that Economies of Scale Were Not Passed on to Investors

Second, Plaintiffs fail to allege facts showing that SIMC failed to share any economies of scale that may have been achieved.  To support their theory that economies of scale were not shared, Plaintiffs rely completely on the assertion that "SIMC has charged the same fee rates to the SEI Funds . . . despite the SEI Funds' significant growth" (Compl. ¶ 30.).  Once again, this exact sort of allegation has been rejected at the motion to dismiss stage.

In *In re Goldman Sachs Mutual Funds Fee Litigation.*, No. 04-2567, 2006 WL 126772 (S.D.N.Y. Jan. 17, 2006), plaintiffs claimed that economies of scale were not shared and, like Plaintiffs here, alleged that the net assets for the Funds increased while the ratio of net expenses did not fall.  *Id.* at *3.  The court dismissed the complaint, and rejected plaintiffs' theory with regard to economies of scale, explaining:  "[m]ere assertions that fees increased with the size of the Funds are not enough to establish that the benefits from economies of scale were not passed on to investors." *Id.*, at *9.  Similarly, in *In re Scudder Mutual Funds*, plaintiffs alleged that the fees increased despite an increase in the size of the funds.  2007 WL 2325862 at *16.  The court dismissed the complaint, explaining that "Plaintiffs neglect to specify how any purported economies of scale were not passed on to the investors."  *Id*.  These types of allegations were also rejected in *In re Franklin Mutual Funds Fee Litigation*.  In response to plaintiffs' allegation

that the funds grew very large but the advisory fees were not reduced, the court stated that "[i]f plaintiffs were allowed to state a § 36(b) claim based upon such paltry allegations, then any fund that grew over time while not simultaneously lowering its fees would be subject to suit under the ICA.  This cannot be allowed."  478 F. Supp. 2d at 687.[21]

### C.    Plaintiffs Plead No Facts Regarding SIMC's Profitability

Plaintiffs plead no facts about SIMC's profitability.  Instead, Plaintiffs regurgitate their unsupported conclusion that "SIMC's incremental costs of providing management services to the SEI Funds are not substantial" and then state that SIMC retained $10.3 million in advisory fees in fiscal year 2012.  (Compl. ¶ 32.)  Alleging that SIMC's "incremental costs" are "not substantial" is insufficient, as such assertions provide the Court with no basis to determine SIMC's profitability.  *See Hoffman*, 591 F.Supp. 2d at 539 (allegation that adviser received a "windfall" was "entirely unsatisfactory given that the complaint does not allege sufficient information for the Court to determine the profitability of Defendants, which is a prerequisite to establishing this factor").

Rather than offering any facts regarding SIMC's profitability, Plaintiffs allege that SIMC must receive excess profits because "each individual sub-advisers' fees are much smaller than defendant SIMC's fee, [and] upon information and belief, the sub-advisers still make a profit." (Compl. ¶ 33).  This allegation is not only insufficient, it is misleading.  As Plaintiffs'

---

[21]    Plaintiffs' allegations regarding economies of scale fail for the same reasons the allegations in these cases failed.  However, Plaintiffs allegations here are even worse. Despite SIMC's fee waivers being disclosed in the Funds' public filings (and being recognized by Plaintiffs (Compl. ¶ 25)), Plaintiffs seek to ignore the existence of these fee waivers by claiming that they are "minimal."  Putting aside Plaintiffs' characterization of the waivers, it is clear that waivers are one of several ways that economies of scale can be shared; one other example is that fees ban be set lower at inception in anticipation of later potential economies of scale.  *In re Am. Mut. Funds Fee Litig.*, 2009 WL 5215755, at *29.  Plaintiffs' ignore all of these possibilities.

acknowledge, SIMC pays the sub-advisers' fees out of the advisory fees it receives (Compl. ¶ 32.); thus, SIMC's advisory fees -- *before paying the sub-advisers* -- are necessarily greater than the sub-advisers' fees.  However, the total amount of fees the sub-advisers collectively receive is substantially *greater than* the amount of fees retained by SIMC. (*Id*.)

Moreover, "each individual sub-adviser" was paid a percentage corresponding to the amount of assets allocated to it.  Given that each sub-adviser was responsible for only a portion of a Fund's assets, any comparison between the size of SIMC's fees and the fees of "each individual sub-adviser's fees" is of no help in determining whether SIMC is obtaining outsized profits.

In short, Plaintiffs have pleaded, at most, that SIMC "make[s] a profit."  (Compl. ¶ 33.) But "Section 36(b) does not prohibit an investment adviser from making a profit, nor does it regulate the level of profit."  *In re Am. Mut. Funds Fee Litig.*, 2009 WL 5215755, at *50 (citing S.Rep. No. 91–184, at 5 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4902); *see also Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 573 F. Supp. 1293, 1316 (S.D.N.Y. 1983), *aff'd*, 740 F.2d 190 (2d Cir. 1984) ("[The adviser] and its affiliates are entitled to recoup their costs and to make a fair profit without having to fear that they have violated Section 36(b)."). Because Plaintiffs fail to plead any facts showing that SIMC received some level of unconscionable profit, their allegations regarding profitability do not support a Section 36(b) claim.[22]

---

[22]   Even though SIMC is owned by a public company, Plaintiffs have not pointed to any public disclosure to show that SIMC's profits were excessive.  Furthermore, courts have deemed a wide range of profit margins acceptable.  *See, e.g.*, *In re Am. Mut. Funds Fee Litig.*, 2009 WL 5215755, at *50 (pre-tax profit margins ranging from 30% to 52% all fall within acceptable range); *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F.Supp. 472, 494 (S.D.N.Y. 1988) (pre-tax margin of 33% acceptable); *Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F.Supp. 962, 978-79 (S.D.N.Y. 1967) (pre-tax margin of 77.3% and post-tax margin of 38.6% acceptable); *Meyer v. Oppenheimer Mgmt. Corp.*, 707 F.Supp. 1394, 1401 (S.D.N.Y. 1988), *aff'd*, 895 F.2d 861 (2d Cir. 1990) (pre-tax margin

### D.   Plaintiffs Allege No Facts Regarding Comparative Fee Structures Or Fall-Out Benefits

Plaintiffs do not even attempt to allege facts regarding two of the *Gartenberg* factors -- how SIMC's fee structures compare to the fee structures of similar advisers and whether SIMC receives any "fall-out benefits" as a result of its relationship with the Funds.  Plaintiffs do not allege that SIMC's fees are higher than its competitors' fees.  They do not allege that other fund managers who employ a similar "manager of managers" strategy and perform similar services retain a smaller portion of the total advisory fees vis-à-vis the sub-advisers than does SIMC.  And Plaintiffs do not allege that SIMC received any fall-out benefits from its relationship with the Funds.  Thus, these two factors weigh against Plaintiffs.

* * *

Plaintiffs fail to plead facts sufficient to state a claim under the demanding standard adopted by the Supreme Court in *Jones v. Harris Associates*.  They do not plead facts showing that the Independent Trustees were not independent or that the Board's process was somehow flawed.  They also fail to plead facts showing that SIMC performed "almost no work," that the nature and qualify of SIMC's work did not warrant its retention of a minority of the management fees, that economies of scale existed and were not shared, or that SIMC's fees were higher than competitors' fees.  As such, their Section 36(b) claim should be dismissed.[23]

---

of 89% acceptable); *Kalish*, 742 F.Supp. at 1236, 1250 (post-tax margin of 37.8% acceptable).

[23]   Plaintiffs will undoubtedly cite *Kasilag v. Hartford Investment Financial Services, LLC*, CIV. A. No. 11-083, 2012 WL 6568409 (D.N.J. Dec. 17, 2012).  But that case is easily distinguishable.  First, the fee split in *Kasilag* is far different than the split here.  Specifically, the management fees charged by the adviser in *Kasilag* were "*on average three times (and sometimes more than five times) the amount [the adviser] pays its*

## V.   PLAINTIFFS' COMPLAINT ALSO FAILS FOR THE INDEPENDENT REASON THAT PLAINTIFFS MAKE NO TIMELY CLAIM ABOUT SIMC'S FEES

Beyond Plaintiffs' failure to plead facts satisfying *Jones v. Harris Associates*, Plaintiffs' claim fails for a second, independent reason:  Plaintiffs make no allegations about SIMC's fees that are actionable under Section 36(b).  Section 36(b) provides that "[n]o award of damages shall be recoverable for any period prior to one year before the action was instituted."  15 U.S.C. § 80a-35(b)(3).  Plaintiffs filed the Complaint on December 11, 2013; therefore, they cannot recover damages for any period prior to December 11, 2012.  *See In re Franklin Mut. Funds Fee Litig.*, 478 F. Supp. 2d at 686 (dismissing 36(b) claims because the "Complaint fail[ed] to allege any facts regarding the fees charged to those Funds during March 10, 2005 and March 10, 2006" -- the one-year period before the complaint was filed); *In re Dreyfus Mut. Funds Fee Litig.*, 428 F.Supp.2d 342, 352 (W.D.Pa. 2005) ("Section 36(b) contains a one year statute of limitations . . . This case was instituted on January 30, 2004.  Therefore, plaintiffs cannot recover any damages sustained prior to January 30, 2003.").  Yet, the Complaint contains allegations related solely to the fees paid to SIMC during the Funds' 2012 fiscal years, which Plaintiffs acknowledge ended on September 30, 2012 and August 31, 2012, *i.e.*, further back in time than the most distant date (December 11, 2012) permitted by the statute of limitations.  (Compl. ¶ 26.) The Complaint is totally devoid of allegations that SIMC charged excessive fees at any time during the one year period prior to its filing.  Accordingly, Plaintiffs' claim is time barred and

---

*subadvisers*"  *Id*. at *3 (emphasis added).  Here, by contrast, SIMC retained only 37% of the overall fees; the sub-advisers kept the remaining 63%.  Second, the *Kasilag* plaintiffs alleged that the trustees had not acted conscientiously because, among other things, they approved "fees for an adviser that had been found guilty of committing fraud and deceit. . . ."  *Id*. *7.  Here, Plaintiffs make no allegations calling into question the Board process, let alone allegations like this.  Finally, plaintiffs in *Kasilag* compared the adviser's fees to Vanguard's fees, and the court gave the comparison "some" weight because both the adviser and Vanguard "employ[ed] the same sub-adviser."  *Id*. at *5.  Here, Plaintiffs make no allegations whatsoever about competitors' fees.

fails for the additional reason that no allegation is made with respect to the only time period covered by Section 36(b).

## VI.     THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE

The Complaint falls far short of satisfying the demanding standard of *Jones v. Harris Associates* for overcoming the deference owed to the Independent Trustees' informed decision to approve the Advisory Agreements.  Thus, the Complaint should be dismissed for failure to state a claim.

Further, in light of their heavy burden, Plaintiffs, at a minimum, should be required to come forward now with some articulation of facts that could plausibly support their claims, before being given an opportunity to re-plead.  Indeed, the Second Circuit has "decline[d] to permit [a Section 36(b)] plaintiff 'with a largely groundless claim to simply take up the time of a number of people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the discovery process will reveal relevant evidence."  *Amron*, 464 F.3d at 346 (2d Cir. 2006); *cf. Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 335 n.4 (3d Cir. 2011) (noting concerns that even non-meritorious claims may create "hydraulic pressure to settle").  This Court, too, should direct Plaintiffs to produce at this time facts sufficient to meet their pleading burden.  If they fail to do so, the Complaint should be dismissed with prejudice.

February 24, 2014

Respectfully submitted,

DECHERT LLP

/s/ *Steven B. Feirson*
Steven B. Feirson (PA I.D. No. 21357)
steven.feirson@dechert.com
Michael S. Doluisio (PA I.D. No. 75060)
michael.doluisio@dechert.com
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
Telephone:     (215) 994-2489

Of counsel:

Matthew L. Larrabee
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036
Tel:  (212) 698-3578
E-mail:  matthew.larrabee@dechert.com

Emily Shea
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
Tel:  (202) 261-3378
E-mail:  emily.shea@dechert.com

*Attorneys for Defendant*

43