**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| STEVEN CURD and REBEL CURD, Derivatively on Behalf of SEI INTERNATIONAL EQUITY FUND, SEI HIGH YIELD BOND FUND, SEI TAX-MANAGED LARGE CAP FUND, SEI TAX-MANAGED SMALL/MID CAP FUND, and SEI INTERMEDIATE-TERM MUNICIPAL FUND, | ) ) ) ) ) ) ) ) ) | Case No. 2: 13-cv-07219 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| SEI INVESTMENTS MANAGEMENT CORPORATION, and SEI INVESTMENTS GLOBAL FUNDS SERVICES, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR
MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................. 4

I.     PLAINTIFFS MISSTATE THE APPLICABLE STANDARD ....................................... 4

II.    PLAINTIFFS' OPPOSITION RELIES UPON THE COURT IGNORING THE
SUBSTANCE OF THE AMENDED COMPLAINT ....................................................... 8

     A.     The Court May Consider Documents Referenced In The Amended
Complaint That Contradict Plaintiffs' Conclusory Allegations............................ 8

     B.     Plaintiffs Insist That This Court Must Turn A Blind Eye To Their Own
Allegations ..................................................................................................... 10

III.    THE CASES PLAINTIFFS CITE ARE DISTINGUISHABLE ..................................... 12

IV.    PLAINTIFFS FAIL TO ALLEGE ANY OTHER PLAUSIBLE BASIS FOR
CONCLUDING THAT SIMC'S FEE IS EXCESSIVE UNDER SECTION 36(B)....... 16

     A.     Plaintiffs' Allegations Regarding Purported Economies Of Scale Do Not
Further Their Cause ........................................................................................ 16

     B.     Plaintiffs' Weak Vanguard Comparisons Add Nothing To Their Claim ............ 18

     C.     Plaintiffs' Allegations Regarding The Prime Obligation Fund And
Liquidity Fund Do Not Save Their Claim .......................................................... 19

     D.     Plaintiffs' Eleventh Hour Allegation Regarding Fall-Out Benefits Is
Immaterial ...................................................................................................... 21

V.    Plaintiffs Fail To Allege Facts Calling Into Question The Independence Or
Conscientiousness Of The Independent Trustees ........................................................ 22

VI.    PLAINTIFFS FAIL TO ALLEGE A SECTION 36(B) CLAIM REGARDING
ADMINISTRATIVE FEES ...................................................................................... 24

VII.    PLAINTIFFS ADMIT THEIR CLAIM IS UNTIMELY ............................................... 26

CONCLUSION......................................................................................................... 28

# TABLE OF AUTHORITIES

**CASES**

*ALA, Inc. v. CCAIR, Inc.*,
29 F.3d 855 (3d Cir. 1994)................................................................................................11

*American Chemicals & Equipment, Inc. 401(k) Retirement Plan v. Principal
Management Corp.*,No. 14-00044, 2014 WL 5426908 (S.D. Iowa Sept. 10, 2014).............13

*Amron v. Morgan Stanley Inv. Advisors Inc.*,
464 F.3d 338 (2d Cir. 2006).............................................................................................17

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).............................................................................................6, 7, 11

*Batra v. Investors Research Corp.*,
144 F.R.D. 97 (W.D. Mo. 1992).......................................................................................22

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).......................................................................................................6, 7

*Boyce v. AIM Mgmt. Grp. Inc.*,
No. 04-2587, 2007 WL 7117575 (S.D. Tex. Sept. 17, 2007)..................................................27

*Curran v. Principal Management Corp.*,
No. 09-cv-00433, 2010 WL 2889752 (S.D. Iowa June 8, 2010).......................................13, 17

*Dumond v. Massachusetts Financial Services Co.*,
No. 04-11458, 2006 WL 149038, at *3 (D. Mass. Jan. 19, 2006).........................................24

*Gallus v. Am. Express Fin. Corp.*,
370 F. Supp. 2d 862 (D. Minn. 2005)................................................................................21

*Hoffman v. UBS-AG*,
591 F. Supp. 2d 522 (S.D.N.Y. 2008)................................................................................17

*In re Dreyfus Mut. Funds Fee Litig.*,
428 F. Supp. 2d 342 (W.D. Pa. 2005)................................................................................27

*In re Franklin Mut. Funds Fee Litig.*,
478 F. Supp. 2d 677 (D.N.J. 2007) ...............................................................................26, 27

*Jones v. Harris Associates, L.P.*,
559 U.S. 335 (2010)................................................................................................ *passim*

*Kasilag v. Hartford Investment Financial Services, LLC*,
No. 11-1083, 2012 WL 6568409 (D.N.J. Dec. 17, 2012)................................................ *passim*

*Mele v. Fed. Reserve Bank of New York*,
    359 F.3d 251 (3d Cir. 2004), *as amended* (Mar. 8, 2004) ......................................................9

*meVC Draper Fisher Jurveston Fund I, Inc. v. Millenium Partners, L.P.*,
    260 F. Supp. 2d 616 (S.D.N.Y. 2003)................................................................................21

*Millenco L.P. v. MEVC Advisors, Inc.*,
    No. 02-142, 2002 WL 31051604 (D. Del. Aug. 21, 2002)....................................................12

*Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*,
    998 F.2d 1192 (3d Cir. 1993), *aff'd*, 215 F.3d 407 (3d Cir. 2000)..........................................9

*Reso v. Artisan Partners Limited Partnership*
    2011 WL 5826034 (E.D. Wisc. Nov. 18, 2011) ...........................................................23, 24

*Sivolella v. AXA Equitable Life Insurance Co.*,
    No. 11-4194, 2012 WL 4464040 (D.N.J. Sept. 25, 2012)....................................................12

*Strougo v. BEA Assocs.*,
    188 F. Supp. 2d 373 (S.D.N.Y. 2002)................................................................................23

*Waris v. Mackey*,
    No. 09-1103, 2009 WL 4884204 (E.D. Pa. Dec. 15, 2009)..................................................18

*Yampolsky v. Morgan Stanley Inv. Advisers Inc.*,
    No. 03 CIV. 5710, 2004 WL 1065533 (S.D.N.Y. May 12, 2004).........................................16

*Zehrer v. Harbor Capital Advisors, Inc.*,
    No. 14-789, 2014 WL 6478054 (N.D. Ill. Nov. 18, 2014) ..................................................15

## STATUTES

15 U.S.C. § 80a-2(a)(20)(B) ...............................................................................................6

15 U.S.C. § 80a-35(b)(3) ..................................................................................................26

15 U.S.C. § 80a-35(b)(1) ........................................................................................... *passim*

## OTHER AUTHORITIES

2 Clifford E. Kirsch, MUTUAL FUNDS AND EXCHANGE TRADED
    FUNDS REGULATION § 42:2.2 (3d ed. 2013). .........................................................22

1 Clifford E. Kirsch, MUTUAL FUNDS AND EXCHANGE TRADED
    FUNDS REGULATION § 6.4 (3d ed. 2013)...............................................................7

## INTRODUCTION

In its response to the Motion to Dismiss, Plaintiffs seek haven in: (1) a standard for judging their allegations that is completely at odds with the standard laid down by the United States Supreme Court in *Jones v. Harris Associates, L.P.*, 559 U.S. 335, 345-46 (2010); (2) the assertion that this Court must ignore the allegations set forth in their own Amended Complaint and the very documents upon which they rely; and (3) citation to inapplicable "precedent" and repeated mischaracterization of their own allegations. Plaintiffs' attempt to evade their own pleading and binding legal principles should fail. The Amended Complaint, like the original Complaint, should be dismissed.

In *Jones*, the United States Supreme Court carefully laid out the legal structure which governs Section 36(b) claims. Pursuant to that structure, the independent directors are recognized as the primary guardians of shareholders' rights. Only in the unusual instance where the advisory fee "is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining" are courts intended to step in. *Jones*, 559 U.S. at 345-46. As the Supreme Court explained, Section 36(b) does not "permit a compensation agreement to be reviewed in court for 'reasonableness'" and "the standard for fiduciary breach under section 36(b) does not call for judicial second-guessing of informed board decisions." *Id.* at 352, 354. Indeed, Congress placed the primary burden of protecting shareholders on the directors, rather than on the courts, precisely because it recognized, among other things, that "courts are not well suited" to evaluate mutual fund advisory fees. *Id.* at 353. Thus, the demanding *Jones* standard reflects the congressional choice to "rely largely upon [independent director] 'watchdogs' to protect shareholders interests." *Id.*

Plaintiffs try to escape the clear policy choice made by Congress by insisting upon a very different and much less stringent standard. Plaintiffs argue that they can state a claim by alleging

nothing more than that SIMC selected sub-advisers to help manage the funds, but nonetheless retained some portion of the advisory fees.  How such allegations could possibly meet the *Jones* standard, Plaintiffs never actually say.  Plaintiffs admit in their own Amended Complaint, and the documents to which they cite make clear, that the Defendants performed numerous services for the Funds.  For example, Plaintiffs acknowledge that the Defendants set fund strategy; evaluated, selected, monitored, and replaced sub-advisers; continually evaluated the performance of the Funds; ensured the Fund's compliance with law and their investment limitations; maintained the Funds' books and records; valued the assets held by the Funds and calculated the Fund NAV's; prepared the Funds' financial statements; and reported to the board.  Plaintiffs do not deny, because they cannot, that these services had real value.  And, Plaintiffs further admit that, in exchange for providing these valuable services, Defendants retained only 40% of the fees paid.

Against this backdrop of a pleading which alleges the provision of numerous valuable services in exchange for materially less than half of the fees, Plaintiffs fail to show why or how the Defendants have crossed the line and charged a fee that is "so disproportionately large that it bears no reasonable relationship to the services rendered." *Jones*, 559 U.S. at 345-46.  Certainly, even Plaintiffs would have to admit that some level of compensation is appropriate.  But, Plaintiffs plead no facts establishing what level would be appropriate and why any amount above that level would be "so disproportionate."  Would retention of 37% of the fees, rather than 40%, have been acceptable? Would 28%?  Plaintiffs never say.  Nor do they allege facts showing that the fees -- which were approved by the Board, acting with guidance from independent counsel -- "could not been the product of arms-length bargaining."  Rather, Plaintiffs invite the Court to

simply disregard the judgment of the statutorily designated "watchdogs" for the shareholders – the directors.  This, the Court should not do.

Plaintiffs' "standard" is, in fact, no standard at all.  Not only is it contrary to *Jones*, but it would put at risk the hundreds of advisers across the country who use a manager-of-managers structure.  Plaintiffs repeatedly argue that they state a claim by doing nothing more than alleging that SIMC hired sub-advisers and retained some portion of the advisory fees -- even if SIMC retained far less than half of those fees.  But the Investment Company Act expressly allows for sub-advised mutual funds and the SEC has issued hundreds of orders expressly allowing mutual fund complexes to adopt this model.  As such, Plaintiffs' proposed "standard" would automatically expose every one of these hundreds of advisers to potential liability, or, at a minimum, to long drawn out and expensive litigation.  Plaintiffs' argument simply proves far too much.

Recognizing that the allegations of their own Amended Complaint doom their claim, Plaintiffs argue that the Court should ignore their pleading, especially the allegations which deal with the various services that SIMC and SIGFS actually performed and the fees that they actually received in return for performing those services.  However, the allegations about the services performed by Defendants are *undisputed*:  in fact, they are admitted in Plaintiffs' Amended Complaint or set forth in the documents upon which Plaintiffs themselves rely.  If, as Plaintiffs argue, the Court is not allowed to consider a complaint's allegations about the services performed or the level of fees charged, then every plaintiff could state a claim -- and impose years of costs and burden on mutual fund advisers -- by merely alleging a legal conclusion that fees were "excessive" and then imploring the Court to ignore the remainder of the Amended Complaint.  Such a result is not only inconsistent with the basic principle that a plaintiff owns the

allegations of the complaint, but also, more importantly in this setting, eviscerates the public policy choice of Congress that, except in extraordinary circumstances, the judgment of the directors in these matters should be respected. Thus, as numerous courts dismissing Section 36(b) claims have made plain, a plaintiff must allege facts that satisfy the demanding *Jones* standard or have the asserted 36(b) claim dismissed.

Finally, the Amended Complaint is not meaningfully different than Plaintiffs' first, unsuccessful Complaint. Plaintiffs' new allegations -- primarily inapt comparisons to Vanguard funds -- have been rejected by other courts. And, Plaintiffs' mischaracterizations of their own allegations and citation to inapplicable legal precedent fare no better this time than when Plaintiffs made them in their original opposition to the Motion to Dismiss.

In short, there is nothing alleged here to justify second-guessing the judgment of the Trustees and exposing Defendants to years of costly and disruptive discovery. As with Plaintiffs' original Complaint, Plaintiffs' Amended Complaint fails to state a claim under Section 36(b). In addition, as with their first Complaint, the Amended Complaint is untimely as a matter of law. Accordingly, the Amended Complaint should be dismissed with prejudice.

## ARGUMENT

## I.     PLAINTIFFS MISSTATE THE APPLICABLE STANDARD.

Plaintiffs acknowledge, as they must, that "[u]nder Section 36(b), the question at the pleading stage is whether Plaintiffs have alleged facts which would satisfy the basic standard articulated in *Gartenberg* that the fees are so disproportionately large, that they bear no reasonable relationship to the services rendered or that they could not have been the product of arm's length bargaining." Opp'n Br. at 11 (internal citations omitted). Yet aside from a mechanical nod to the rule expressly adopted by the Supreme Court in *Jones v. Harris Associates, L.P.*, 559 U.S. 335, 345-46 (2010), Plaintiffs ignore the operative standard and argue

4

for the application of a much lower threshold to Section 36(b) claims involving sub-advisers. According to Plaintiffs, "all [they] were required to plead . . . is that SIMC was primarily hired to manage the investments of the SEI Funds and that nearly all of these primary services were passed on to sub-advisers . . . ." Opp'n Br. at 4.  Plaintiffs go on to say that, so long as their Amended Complaint contains these threadbare allegations, all other factual allegations should be ignored.  Plaintiffs' effort to create a more favorable standard for them fails as an initial matter because it wholly disregards the deference owed to the Board, the entity charged in the first instance with the task of determining whether the fees were reasonable in light of the services performed.  It also fails because it:  (1) falls far short of meeting the demanding *Jones* "so disproportionate" standard necessary to overcome the deference owed to the trustees; (2) does not satisfy even generally applicable pleading requirements; and (3) leaves the Court without any reasoned basis for assessing whether the fees at issue were allegedly excessive.

Plaintiffs' plea for a lesser standard disregards the burden put upon them by Section 36(b).  Plaintiffs bear the burden of proof under Section 36(b), 15 U.S.C. § 80a-35(b)(1), and, as noted, they must meet the substantial burden of alleging facts showing that the fees are "so disproportionately large" that they bear "no reasonable relationship to the services rendered and could not have been the product of arms length bargaining."  *Jones*, 559 U.S. at 345-46.  Here, Plaintiffs' allegation that SIMC performed some services, retained sub-advisers to perform others, but kept a portion of the fees does nothing to suggest that the fees charged bore "no relationship to the services rendered" and "could not have been the product of arms length bargaining."  Instead, Plaintiffs' allegations are merely another way of saying that SIMC, in utilizing the perfectly legal manager-of-managers structure, has committed some sort of *per se*

violation of Section 36(b).  As such, Plaintiffs do not come close to satisfying the demanding

standard laid out by the Supreme Court in *Jones*.[1]

Nor do Plaintiffs even satisfy the pleading standards applicable to all claims, whether

brought under Section 36(b) or not.  Under Supreme Court precedent, a plaintiff does not state a

claim by alleging facts that could be "merely consistent with" a defendant's liability.  *Bell Atl.

Corp. v. Twombly*, 550 U.S. 544, 557 (2007).  Rather, the plaintiff must allege facts showing that

the "'that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting

Fed. R. Civ. P. 8(a)(2)).  Here, Plaintiffs' allegations that SIMC hired sub-advisers but retained a

portion of the overall advisory fees describe conduct that is common to a huge portion of the

mutual fund industry.  In fact, if these allegations were sufficient, then *every* adviser that retains

sub-advisers would violate Section 36(b) and the decision of *every* board that approved of the

use of sub-advisers would be subject to judicial second-guessing.[2]  But, this obviously cannot be

the case, because the ICA specifically provides for the use of sub-advisers, *see* 15 U.S.C. § 80a-

2(a)(20)(B), and the SEC routinely grants exemptive orders allowing investment advisers to hire

---

[1]    Where, as here, plaintiffs have failed to meet their burden to plead facts sufficient to
satisfy the demanding *Jones* standard, courts have not hesitated to dismiss Section 36(b)
claims.  *See* Mot. to Dismiss Br. at 21 n.10 (citing eleven Section 36(b) cases).  In light of
generally applicable pleading requirements, the especially demanding *Jones* standard,
and this case law, Plaintiffs are flat wrong to argue that the standard is "low" (Opp'n Br.
at 2) and that they need only make the single, conclusory allegation described above.

[2]    It is perhaps not surprising that Plaintiffs advocate for such a low pleading standard.  In
the last eighteen months, their counsel has filed six of these cookie-cutter complaints
across the country.  As such, it is in their interest to argue for a lenient standard that is
divorced from the standard mandated by the Supreme Court and the facts associated with
each particular defendant.

and replace sub-advisers without securing shareholder approval.  *See* 1 Clifford E. Kirsch, MUTUAL FUNDS AND EXCHANGE TRADED FUNDS REGULATION § 6:4 (3d ed. 2013).[3]

Lastly, Plaintiffs' argument fails because it provides the Court with no reasoned basis to disregard the Board's decision and even begin to assess whether the Defendants' fees were excessive.  Significantly, Plaintiffs do not allege various crucial facts:

- Plaintiffs do *not* allege facts showing that the services SIMC performs are not labor and time-intensive.

- Plaintiffs do *not* allege facts showing that SIMC competitors charge less than SIMC for performing similar services.

- Plaintiffs do *not* allege facts showing that SIMC received outsized profits.

- Plaintiffs do *not* allege facts showing that SIMC bears no risk or responsibility for fund performance or legal compliance.

- Plaintiffs make *no* allegations that effectively call into question the independence of the Independent Trustees or the process that the Independent Trustees, guided by their independent counsel, followed when approving of the fees.

Given Plaintiffs' admissions and failure to plead facts, there is simply no basis for the Court to conclude that Plaintiffs have met their burden of pleading facts sufficient to meet the general pleading standards laid down in *Twombly* and *Iqbal*, let alone the demanding "so disproportionate" standard of *Jones*.

---

[3]     Since 1995, the SEC has issued "over 200" exemptive orders "enabl[ing] funds to realize certain efficiencies while protecting the interests of their shareholders." SEC Division of Investment Management, Feb. 2014 (Ex. 37 - ECF No. 57).

## II.     PLAINTIFFS' OPPOSITION RELIES UPON THE COURT IGNORING THE SUBSTANCE OF THE AMENDED COMPLAINT

In the hopes of avoiding any analysis of their Amended Complaint, Plaintiffs repeatedly argue that this Court should turn a blind eye to the facts set forth in the Amended Complaint. For instance, Plaintiffs argue that the Court cannot consider "the nature of services provided and the size of the fee" -- even though these facts are the central inquiry at issue in deciding whether the allegations of a complaint meet the "so disproportionate" test adopted in *Jones*.  Opp'n Br. at 34.  Plaintiffs also argue that the Court cannot consider, among other things:

- the "Board's independence and the thoroughness of its process" (Opp'n Br. at 3)

- "the quality and quantity of services performed by the investment adviser" (*id*. at 4)

- "that the investment adviser 'retain[ed] significant responsibility for the Fund's management' and performed comprehensive services" (*id*. at 21)

- the fact that SIMC oversees many sub-advisers, whereas "the investment adviser [in another case] had to oversee only one sub-adviser" (*id*. at 17)

- "the fee splits" between SIMC and the sub-advisers compared to other cases (*id*. at 19)

- Undisputed "fact-based distinctions between the SEI Funds and the Vanguard funds" (*id.* at 32; *see also id*. at 30-31)

Obviously, Plaintiffs make these arguments because they know that the facts that they have alleged (and that are set forth in the very documents they cite) doom their claims.  But it cannot be possible that Plaintiffs state a claim by merely parroting the words "excessive" or "sub-advisers."

### A.     The Court May Consider Documents Referenced In The Amended Complaint That Contradict Plaintiffs' Conclusory Allegations.

In their Opening Brief, Defendants pointed to several publicly available documents -- explicitly relied upon by Plaintiffs -- which flatly contradict Plaintiffs' conclusory allegations.

*See* Mot. to Dismiss Br. at 23, 28-29.  In their Opposition, Plaintiffs do not dispute the accuracy

of any of these documents or the reliance of their pleading on them.  Instead, they argue that "the

Court should ignore the multitude of attorney-prepared, self-serving brochures, prospectuses,

proxy statements and other [SEC] filings Defendants placed improperly before the Court as part

of an attempt to rebut Plaintiffs' allegations."  Opp'n Br. at 3.  However, *Plaintiffs* put these

documents before the Court when *Plaintiffs* explicitly cited to, quoted from, and relied upon

these very documents.[4]  Thus, there is no question that the Court may consider them.  *See*

*Pension Benefit Guar. Corp*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("a court may consider an

undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if

the plaintiff's claims are based on the document"), *aff'd*, 215 F.3d 407 (3d Cir. 2000); *Mele v.*

*Fed. Reserve Bank of N.Y.*, 359 F.3d 251, 256 n.5 (3d Cir. 2004), *as amended* (Mar. 8, 2004) ("a

document *integral* to or *explicitly* relied upon in the complaint may be considered without

converting the motion [to dismiss into one for summary judgment] . . . so that plaintiff cannot

maintain a claim by extracting an isolated statement from a document and placing it in the

complaint, even though if the statement were examined in the full context of the document, it

would be clear that the statement [did not support the claim]") (emphasis in original; internal

citations and quotations omitted).[5]

---

[4]     *See, e.g.,* Am. Compl. ¶¶ 35, 38 (quoting SIMC's Advisory Agreement); *id*. ¶ 36 (quoting
        SIMC's Sub-Advisory Agreement); *id*. ¶ 39 (citing the Funds' Statement of Additional
        Information ("SAI")); *id*. ¶ 41 (citing the Funds' Supplement to the SAI); *id*. ¶ 90 (citing
        SIGFS's Administrative and Transfer Agency Agreement and the Funds' N-1A filings,
        which encompass the Funds' prospectus and SAI); *id*. ¶¶ 43, 50, 65, 75, 76, 91, 93, 98
        (citing and quoting the Funds' Annual Report); Am. Compl. ¶¶ 40, 42, 51, 54, 69, 78, 92,
        103 (alleging information only available from the Funds' SEC filings).

[5]     Plaintiffs actually conceded that documents cited in a complaint can be considered on a
        motion to dismiss in their opposition brief to Defendants' motion to dismiss the original
        complaint. *See* First Opp'n Br. at 15 (Apr. 28, 2014), ECF No. 21.  Moreover, the cases
        Plaintiffs cite regarding a requirement that judicial notice be requested (Opp'n Br. at 21

**B.    Plaintiffs Insist That This Court Must Turn A Blind Eye To Their Own Allegations.**

Even considering just the allegations on the face of the Amended Complaint, it is clear that Plaintiffs have failed to state a claim.  Plaintiffs, themselves, affirmatively assert that SIMC itself -- not the sub-advisers -- provides various services to the Funds.  Specifically, Plaintiffs admit that SIMC is responsible for selecting "numerous sub-advisers" (Am. Compl. ¶ 36.) and "overseeing [their] investments, [their] compliance with regulatory requirements, and vetting [their] personnel and investment strategies."  (*Id.* ¶ 43.)  Plaintiffs also concede that SIMC must "continuously review, supervise and…administer the investment program" of the Funds.  (*Id.* ¶ 35.)[6]  And Plaintiffs, themselves, affirmatively assert that in exchange for providing these services, SIMC takes just a minority of the total advisory fee.  (*Id.* ¶ 41.)

Confronted now with their own assertions, Plaintiffs are forced to resort to pleading with the Court to ignore their own "fact-based arguments about the nature of services provided and the size of the fee."  Opp'n Br. at 34; *see also id.* 20-21.  But, as discussed above, such a position

---

n. 9) are inapposite because, unlike in this case, they do not relate to documents that the complaint itself relied upon.

[6]    Plaintiffs try to circumvent their critical admission that SIMC provides substantial services to the Funds by attempting to diminish the value of these services, *e.g.*, asserting that "SIMC passed off all liability exposure related to [investment management] decisions to the sub-advisers." Opp'n Br. at 22.  This effort is unavailing.  As an initial matter, the services SIMC provides still have substantial value even if "liability exposure" was assumed by a third party.  Furthermore, Plaintiffs' assertion that SIMC "passed off all liability exposure" is transparently incorrect.  The Sub-Advisory Agreements contain cross-indemnifications, which provide that the sub-advisers are liable for damages resulting from their own willful misfeasance, bad faith, negligence, or reckless disregard, but that ***SIMC is likewise liable*** for damages resulting from its willful misfeasance, bad faith, negligence, or reckless disregard.  *See* Sub-Advisory Agreement ¶ 5 (emphasis added) (Ex. 2 – ECF No. 57).  *See also* Am. Compl. ¶ 35 (noting that the Advisory Agreement provides that the "retention of a sub-adviser by the Adviser shall not relieve the Adviser of its responsibilities under this Agreement").

is incompatible with the *Jones* standard, which even Plaintiffs admit requires a "comparison of each adviser's responsibilities under their respective agreements." *Id.* at 4.

Lastly, Plaintiffs rely upon unsupported conclusions in an effort to have this Court focus on something other than the factual allegations of the Amended Complaint. For instance, while Plaintiffs claim that the Court may not consider the nature of the services SIMC performs, Plaintiffs repeatedly denigrate those services as being "minor" or "minimal." But those conclusions are belied by Plaintiffs' own allegations regarding the services SIMC performs, as well as by documents referenced in the Amended Complaint. *See e.g.*, *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 n.8 (3d Cir. 1994) (conclusions contrary to documents relied upon by *plaintiffs* should be disregarded). They also are insufficient under relevant pleading standards. *Iqbal*, 556 U.S. at 679 (allegations which are "no more than conclusions are not entitled to the assumption of truth").[7]

Even if these conclusory characterizations were credited -- and they should not be -- Plaintiffs' claim still fails. At most, Plaintiffs have alleged that SIMC pays the sub-advisers well over half of the advisory fee to perform the "most costly and important" services, while retaining less than half of the fee as compensation for "less important and less costly" services (Opp'n Br. at 15), including the hiring and supervising of sub-advisers, the continuous reviewing and evaluation of the Funds' investment programs, and the keeping of records and reporting to the board. (*Id.* at 6; Am. Compl. ¶¶ 35-36, 43). Thus, according to Plaintiffs, SIMC received less

---

[7]     Plaintiffs maintain that they "have added factual allegations demonstrating that the asset management services performed by the sub-advisers are far more important and expensive than the remaining largely supervisory services provided by SIMC." Opp'n Br. at 15; *see also id.* at 17. But the only allegation Plaintiffs cite for this proposition -- Paragraph 44 of the Amended Complaint -- describes a passage from a book about personal investing (which contains no information about SIMC's services) and goes on to make more of the same, conclusory assertions that SIMC's fee is "excessive" and its services "limited." *See id.* (citing Am. Compl. ¶ 44).

than half of the fees for performing the less important work.  But Plaintiffs nowhere explain why

such facts render the fees "excessive."  And, more importantly, they nowhere allege facts

explaining why the juxtaposition of those two facts provides a sufficient basis to overturn the

judgment of the Trustees that SIMC's services warranted its fee.  In fact, common sense suggests

just the opposite of what Plaintiffs assert.  The congruity between the portion of fees SIMC

retains (materially less than half) is totally consistent with the portion of the work Plaintiffs

allege it performs (materially less than half).  Certainly, these facts on their own do not provide

any basis for concluding that the fees were "excessive."[8]

## III.   THE CASES PLAINTIFFS CITE ARE DISTINGUISHABLE.

Plaintiffs' summary of Section 36(b) case law is wildly unbalanced.  While ignoring the

host of cases dismissing Section 36(b) claims, Plaintiffs tout six cases involving "sub-adviser

allegations."  But, upon examination, none of these cases supports Plaintiffs' argument.

As an initial matter, four of the cases plaintiffs cite are wholly irrelevant and do not

warrant much discussion:

- *Sivolella v. AXA Equitable Life Insurance Co.*, No. 11-4194, 2012 WL 4464040, at *4 (D.N.J. Sept. 25, 2012), addressed only the plaintiff's *statutory standing*.  Neither the defendant's motion nor the court's ruling said anything at all about the sufficiency of the plaintiff's allegations.  *Id*. at *4-5.

- *Millenco L.P. v. MEVC Advisors, Inc.*, No. 02-142, 2002 WL 31051604 (D. Del. Aug. 21, 2002), involved a closed-end business development company, not a mutual fund.  It also involved many allegations not present here, including that the defendant did not actually

---

[8]    Plaintiffs contend that SIMC's retention of only 40% of the advisory fee is irrelevant because "courts do not impose a specific numeric threshold for fees to be deemed to be excessive."  Opp'n Br. at 23.  But Plaintiffs miss the point.  It is Plaintiffs' burden to plead facts showing that the adviser's fee is "***so disproportionately large*** that it bears no reasonable relationship to the services rendered" -- which Plaintiffs have attempted to do by pointing almost exclusively to the proportion of the fee received and retained by SIMC.  That SIMC retained less than half of the overall fees while performing a significant number of obviously important services is plainly relevant.

invest much of the shareholders' money, *i.e.*, the defendant did not do its job, and falsely inflated the value of the company's assets to reap larger fees.

- In *Curran v. Principal Management Corp*., No. 09-cv-00433, 2010 WL 2889752 (S.D. Iowa June 8, 2010), the plaintiffs alleged that the defendant adviser retained 73% of the total advisory fee, compared to Plaintiffs' allegations that SIMC retained just 40% of the fee. *See* Curran Am. Compl. ¶ 45.[9]  Further, the *Curran* court relied on allegations that the defendant adviser charged the funds more than it charged institutional clients for similar services – allegations not found here.  2010 WL 2889752, at *8-9.  Additionally, *Curran* involved a different product -- so-called "funds of funds" -- with a different fee structure.  *Id*.  The funds were advised by the defendant (which employed a sub-adviser) and invested all their assets in other mutual funds also advised by the defendant (which employed sub-advisers at this level too).  *Id*.  The *Curran* plaintiffs characterized this as a "four-layer" fee structure which allegedly resulted in the defendant adviser's retention of "substantially higher fees than the subadvisors."  *Id*. at *8.

- In *American Chemicals & Equipment, Inc. 401(k) Retirement Plan v. Principal Management Corp.*, No. 14-00044, 2014 WL 5426908, at *1 (S.D. Iowa Sept. 10, 2014), the plaintiff did not even challenge the advisory fees that the defendant received; it challenged another kind of fee called an "acquired fund fee."  *Id*.  Further, the plaintiff alleged that the defendant adviser retained 66% of the acquired fund fee -- a much greater portion of the fees at issue than Plaintiffs allege SIMC retained.  *Id*.  This case also involved a "fund of funds" product.

The remaining two cases Plaintiffs cite likewise do not help Plaintiffs' claim.  First of all, and perhaps most importantly for the purpose of evaluating the issues here, neither court held that a Section 36(b) claim is stated merely by allegations that the adviser retained sub-advisers and yet still retained a portion of the advisory fees.

First, Plaintiffs cite *Kasilag v. Hartford Investment Financial Services, LLC*, No. 11-1083, 2012 WL 6568409 (D.N.J. Dec. 17, 2012).  But, Plaintiffs' reliance on this case is based upon a misunderstanding of the allegations at issue.  Specifically, Plaintiffs argue that *Kasilag* is apt because "the defendants in *Kasilag* retained nearly the same percentage of total advisory fees after paying their sub-advisers (on average, 40% by SIMC and 42% by the *Kasilag* investment

---

[9]      Paragraph 45 of the *Curran* complaint alleges that the adviser received $214,124,000 from both the funds and underlying funds, and the sub-advisers received a total of $56,392,383. *See* Exhibit 1 (May 19, 2014), ECF No. 34.

adviser)." Opp'n Br. at 19. In fact, Plaintiffs go so far as to attach the pages of the *Kasilag* complaint that purportedly support this comparison. *Id.* However, Plaintiffs have misstated both the *Kasilag* plaintiffs' allegations and the *Kasilag* court's holding -- obvious errors which, once corrected, serve only to undermine Plaintiffs' position here. The very pages of the *Kasilag* complaint Plaintiffs attached to their brief show that the *Kasilag* plaintiffs alleged that the adviser retained 63% of the fee, not the purportedly comparable 42% Plaintiffs urge upon the Court here. *See* Ex. B to Opp'n Br. ¶ 47.[10] Moreover, this allegation was important to the court's ruling, as it specifically remarked that the fees charged by the adviser were "on average three times (and sometimes more than five times) the amount [the adviser] pays its sub-advisors." 2012 WL 6568409, at *3. In stark contrast, in this case the fee retained by SIMC was actually *less* than the amount paid to the sub-advisers. Additionally, the *Kasilag* court relied on a number of other allegations not present here, including allegations that the defendant adviser purportedly charged the funds higher fees than it charged either institutional clients or an unaffiliated mutual fund for which it served as sub-adviser. *Id.* at *4-5. Thus, the allegations of *Kasilag* are very different than the allegations here.[11] While Defendants believe that *Kasilag* was wrongly decided and therefore should not be of any help to Plaintiffs, it is, in any event, very different than this case.

---

[10]  Paragraph 47 of the *Kasilag* complaint states that "the total investment management fees charged to the Hartford Funds equaled $157,636,796 ($100,052,943 investment management fees paid to [the adviser] in addition to $57,583,826 in investment management fees paid to the Hartford Funds' sub-advisers."

[11]  The *Kasilag* court also apparently gave weight to the plaintiffs' allegations concerning economies of scale, profitability, and the conscientiousness of the board -- allegations which, unlike SIMC here, the defendant in that case did not even challenge in its motion to dismiss. *Id.* at *5 ("HIFSCO's motion to dismiss does not address the remaining *Gartenberg* factors cited in the Complaint").

14

Finally, Plaintiffs rely on *Zehrer v. Harbor Capital Advisors, Inc.*, No. 14-789, 2014 WL 6478054 (N.D. Ill. Nov. 18, 2014).  But *Zehrer*, like *Kasilag*, was wrongly decided and is, in any event, also easily distinguishable.  As an initial matter, if interpreted as Plaintiffs argue it should be, *Zehrer* would expose any adviser who employs sub-advisers and retains any portion of the advisory fee to Section 36(b) liability.  As discussed above, such an interpretation of Section 36(b) would be at odds with both the relevant pleading standards and the ICA and SEC, both of which allow for subadvised funds.  Moreover, there are several obvious differences between *Zehrer* and this case.  For example, the defendant in *Zehrer* allegedly retained a greater percentage of the total advisory fee than SIMC retained here.  In addition, the plaintiff in *Zehrer* alleged that the adviser in that case used a single manager, an industry model very different that then "multi-manager" approach used by SIMC.  *See* Mot. to Dismiss Br. at 32 n. 17.[12]  These two models involve distinct considerations, economics, and risks.  Indeed, Plaintiffs here admit that SIMC oversaw numerous sub-advisers, and it therefore performed a number of tasks not present when a single sub-adviser is utilized, *e.g.*, researching and selecting numerous sub-advisers with different investment styles for a single fund; allocating a fund's assets among the different sub-advisers; overseeing each of the various sub-advisers; and ensuring that the sub-advisers as a whole are complying with a Fund's investment limitations and working to achieve the Fund's stated goals.  *See* Mot. to Dismiss Br. at 9-11.  As such, *Zehrer* is far different than this case.

---

[12]    Plaintiffs argue that this distinction "is exactly the type of fact-driven weighing of the services" that is "improper on a motion to dismiss."  Opp'n Br. at 17.  But the number of sub-advisers SIMC oversees is apparent from the face of the Amended Complaint (¶ 37) and, as discussed above, factual allegations about the nature of the services SIMC provides are the exact type of allegations the Court should consider in determining whether Plaintiffs have stated a claim under the *Jones* standard.

**IV.    PLAINTIFFS FAIL TO ALLEGE ANY OTHER PLAUSIBLE BASIS FOR CONCLUDING THAT SIMC'S FEE IS EXCESSIVE UNDER SECTION 36(B).**

Plaintiffs essentially concede that their claim rises and falls with their conclusory "sub-adviser-based allegations."  However, they also argue that "additional" allegations about economies of scale, comparisons to Vanguard, fall-out benefits, and so-called duplicative fees "bolster" their Amended Complaint.  *See* Opp'n Br. at 1, 14, 23.  As discussed below, these ancillary allegations do nothing to salvage Plaintiffs' claim.

**A.    Plaintiffs' Allegations Regarding Purported Economies Of Scale Do Not Further Their Cause.**

By their own admission, "Plaintiffs' allegations regarding economies of scale are not the crux of their case."  Opp'n Br. at 26.  Thus, it appears that even Plaintiffs recognize the weakness of their economies of scale allegations.  Indeed, Plaintiffs' economies of scale allegations fail as a matter of law.

Recognizing that the allegations in their original Complaint were insufficient, Plaintiffs claim that they supplemented their allegations by adding "specific details about SIMC's cost structure reflecting that it achieved economies of scale with respect to the services provided to the SEI Funds."  *Id*. at 24.  But, this is patently false.  Plaintiffs cite paragraphs 45-49 of the Amended Complaint as the location of these supposed allegations, but these paragraphs do not even mention SIMC.  Rather, these paragraphs contain more of the same, generalized allegations regarding the mutual fund industry that populated Plaintiffs' original Complaint.  *See* Am. Compl. ¶¶ 45-49.  Allegations of this sort are clearly insufficient.  *See Yampolsky v. Morgan Stanley Inv. Advisers Inc.*, No. 03 CIV. 5710, 2004 WL 1065533, at *2 (S.D.N.Y. May 12,

2004), *aff'd, sub nom., Amron v. Morgan Stanley Inv. Advisors Inc.,* 464 F.3d 338 (2d Cir. 2006).[13]

Plaintiffs also claim that, as set forth in the Annual Report, the Board conceded that economies of scale exist.  Opp'n Br. at 24.  As Defendants' pointed out in their Opening Brief, Plaintiffs' allegations are wrong.  *See* Mot. to Dismiss Br. at 33.  In their opposition, Plaintiffs simply ignore Defendants' point.

As Defendants discussed in their Opening Brief, Plaintiffs' economies of scale allegations fail because Plaintiffs do not allege that SIMC's costs per investor fell as the Funds' assets have risen.  In support of that argument, Defendants cited two cases that dismissed Section 36(b) complaints.  *See id.* (citing *Amron* and *Hoffman*).  Specifically, the *Amron* court found that the plaintiffs alleged "no facts related to the Funds regarding the question of economies of scale" (Opp'n Br. at 25.) because they made "no allegations regarding the costs of performing fund transactions or the relationship between such costs and the number of transactions performed." *Amron v. Morgan Stanley Inv. Advisors Inc.,* 464 F.3d 338, 345 (2d Cir. 2006).  Similarly, the *Hoffman* court dismissed the complaint because it did not contain "*substantive allegation regarding the actual transaction costs at issue and whether the costs per investor increased or decreased as the assets under management grew.*"  *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 540 (S.D.N.Y. 2008) (emphasis added); Opp'n Br. at 25.  In response, Plaintiffs claim to have made "well-pled allegations" of the sort missing in those two cases. Opp'n Br. at 25.  However,

---

[13]     Contrary to Plaintiffs' assertion, *Curran* did not accept the plaintiffs' "generalized statements about the mutual fund industry"; rather, it ignored this "extraneous information" and held only that the plaintiffs' other, more specific allegations stated a claim.  2010 WL 2889752, at *8.

Plaintiffs fail to cite any such allegations.  *See id.*  The reason for this failure is plain:  no such allegations exist.[14]

Likewise, Plaintiffs have not rehabilitated their deficient allegations that SIMC failed to share the benefits of any economies of scale with the Funds.  Putting to one side for the moment the issue that Plaintiffs have failed to adequately plead economies of scale, their own allegations make clear that, even if there were economies of scale to share, SIMC did just that by waiving a total of $3,275,000 in fees charged to the SEI Funds in fiscal year 2013 -- an increase from 2011 and 2012.  (Am. Compl. ¶ 54.)  These waivers are by no means trivial; they represent *21% of the total fees SIMC was entitled to retain*.  (*Id.* ¶¶ 42, 54.)[15]  Thus, Plaintiffs' assertion -- without any factual support -- that SIMC "waived so little that shareholders did not receive a sufficient benefit" is transparently incorrect.

### B.      Plaintiffs' Weak Vanguard Comparisons Add Nothing To Their Claim.

In their Opening Brief, Defendants established that Plaintiffs' attempt to compare the profitability and fee structures of the SEI Funds to certain Vanguard Funds was completely misplaced.  *See* Mot. to Dismiss Br. at 35-40.  In response, Plaintiffs do not even attempt to refute the plethora of reasons why the comparison is inapt.  Nor do they rebut the heap of cases

---

[14]    Plaintiffs cite several cases to support their argument that allegations of fund growth are adequate.  Opp'n Br. at 24-25.  But these pre-*Twombly* cases are inapposite because they merely held that it was *possible* to infer the existence of economies of scale from allegations that the funds grew in size.  *See e.g., Waris v. Mackey*, No. 09-1103, 2009 WL 4884204, at *9 (E.D. Pa. Dec. 15, 2009) ("[a] complaint cannot survive where a court can only infer that a claim is merely possible rather than plausible").

[15]    The fee waivers were borne entirely by SIMC and not the sub-advisers.  *See* SIMT SAI (1/31/2014) at S-64-65 (Ex. 15 – ECF No. 57; STET SAI (12/31/2013) at S-35 (Ex. 21 – ECF No. 57).

rejecting such comparisons out of hand.[16]   Instead, Plaintiffs reiterate, yet again, the refrain that

the Court should pay no attention to what is actually going on in this case, *i.e.*, "fact-based

distinctions between the SEI Funds and the Vanguard funds . . . [are] not appropriate [to

consider] on a motion to dismiss."  *See* Opp'n Br. at 32; *see also id*. at 30.   But, Plaintiffs admit

that in *Kasilag*, which they cite to support their Vanguard allegations, the court "recognized that

it was required to consider fee comparisons in light of the similarities and differences in the

services provided."  *Id*. at 32 (citing *Kasilag*, 2012 WL 6568409, at *4); *see also Jones*, 559 U.S.

at 350 ("courts must be wary of inapt comparisons").   Indeed, the court in *Kasilag* ultimately

gave "limited" weight to allegations regarding Vanguard solely because the funds at issue had

the same investment objectives and strategies and both used Wellington as their sole sub-adviser.

*Kasilag*, 2012 WL 6568409, at *5.   Here, of course, there are no such similarities.   Accordingly,

the Vanguard allegations should be given no weight.

**C.      Plaintiffs' Allegations Regarding The Prime Obligation Fund And Liquidity Fund Do Not Save Their Claim.**

Despite labeling the fees paid by the SEI Funds in connection with their investments in

the Prime Obligation Fund and Liquidity Fund as "duplicative," Plaintiffs still cannot point to a

single factual allegation that the Funds paid twice for the same services.[17]   Indeed, Plaintiffs

---

[16]      Plaintiffs' one attempt to address these cases is to contend that "Plaintiffs have included a more detailed and fact-based Vanguard cost comparison than those rejected in cases cited by Defendants."  Opp'n Br. at 31.  Maybe so, but these cases did not reject comparisons to Vanguard because they were insufficiently detailed; rather, they held that because of its unique, not-for-profit structure, the Vanguard comparison is not meaningful.  *See* Mot. to Dismiss Br. at 35-36 (citing four cases).  In fact, Plaintiffs' "detailed and fact-based" allegations only serve to highlight why their Vanguard comparisons are *particularly* inappropriate.  *See id*. at 36-37, 39-40.

[17]      Moreover, Plaintiffs now concede that it is not enough to simply allege that the Funds paid advisory fees at the fund level and on assets invested in underlying money market funds.  *See* Opp'n Br. at 35.

19

admit that SIMC performs two separate services for the fees paid on the Funds' investments in the Prime Obligation Fund -- "*first*, it serves as the investment adviser placing these cash assets into the Acquired Funds; and *second*, it serves as the investment adviser to the Acquired Funds managing the assets placed into these funds."  Opp'n Br. at 33 (emphasis in original).  Plaintiffs now argue that "the service of allocating cash" at the fund level does not warrant SIMC's fee. *See id*. at 33.  However, Plaintiffs allege no facts which demonstrate that the cash sweep services SIMC provides, which are critically important to meet shareholder redemptions and other liquidity needs (*see* Mot. To Dismiss Br. at 44-45), are not important or of high quality.  Thus, there is no basis to conclude that the $608,600 total paid by the five SEI Funds on their investments in the Prime Obligation Fund (*see id*. at 48) -- representing just 0.007% of the Funds' assets -- is excessive.

Additionally, Plaintiffs do not even address the entirely distinct set of services SIMC provides in connection with the Funds' investments in the Liquidity Fund.  **First**, as adviser to the Funds, SIMC selects, monitors, and pays the fees of sub-advisers that invest the Funds' assets in securities; and **second**, when the Funds lend portfolio securities, SIMC, as adviser to the Liquidity Fund, invests the cash collateral received for the lent securities in short-term, highly liquid securities.  *See* Mot. to Dismiss Br. at 47.  Plaintiffs have not pleaded any facts suggesting that the $135,000 the SEI Funds paid in total on their investments in the Liquidity Fund (*see id*. at 48) -- 0.0016% of the Funds' assets -- is "so disproportionately large."

Rather than addressing Defendants' arguments, Plaintiffs trot out for yet another appearance their old chestnut that these are "fact-based arguments about the nature of services provided and the size of the fee, which are inappropriate at this stage."  Opp'n Br. at 34.  They make this claim notwithstanding the reality that, as discussed above, these facts are essential to

the *Jones* analysis, come straight from the Amended Complaint and the documents referenced in the Amended Complaint, and are not disputed by Plaintiffs.  Further, the cases Plaintiffs cite are inapposite, as they did not involve an adviser's performance of services in connection with a fund's investments in money market funds through a cash sweep or securities lending program, but involved factual allegations that an adviser received "something for nothing."  *See id.*[18]

### D.   Plaintiffs' Eleventh Hour Allegation Regarding Fall-Out Benefits Is Immaterial.

In their Opposition Brief, Plaintiffs for the first time claim that they have made an allegation about fall-out benefits received by SIMC.  Specifically, they now claim that SIMC received a fall out benefit by utilizing LSV, a "partially owned subsidiary," as one of the seven or eight sub-advisers for two of the SEI Funds.  Opp'n Br. at 35.  But this allegation -- whether labeled as a "fall-out" benefit or not -- does not show that SIMC received compensation "so disproportionately large" compared with the services it provided.  LSV received just $625,000 in fees from the SEI Funds in 2013 -- hardly a windfall to SIMC (which owns just 39.3% of LSV).  *See* SIMT Annual Report (9/30/2013) at 265 (Ex. 20 – ECF No. 57); SEIC 2013 10-K at 27 (Ex. 23 – ECF No. 57).  The cases Plaintiffs cite are much different than the instant matter.  They do not involve affiliated sub-advisers, much less suggest that a minority ownership interest in one of many sub-advisers used by a fund renders an advisory fee excessive.[19]  Moreover, the use of

---

[18]    Plaintiffs' reliance on *meVC Draper Fisher Jurveston Fund I, Inc. v. Millenium Partners, L.P.*, 260 F. Supp. 2d 616, 619-20 (S.D.N.Y. 2003) is particularly misplaced.  That case dealt with Section 12(d)(1) of the ICA -- a completely different provision than SEC Rule 12d1-1, a fact made especially obvious considering that the case was decided three years *before* Rule 12d1-1 was even promulgated in 2006.  Moreover, Section 12(d)(1) was designed to prevent complicated pyramiding of funds, while Rule 12d1-1, enacted later, is an exemptive rule that was specifically designed to loosen the constraints of Section 12(d)(1) in the context of a fund's investment in underlying money market funds.

[19]    *See Gallus v. Am. Express Fin. Corp.*, 370 F. Supp. 2d 862, 867 (D. Minn. 2005) (complaint which included allegations that defendant received benefits from soft-dollar

affiliated sub-advisers is a common industry practice permitted by the SEC.  *See* 2 Clifford E.

Kirsch, MUTUAL FUNDS AND EXCHANGE TRADED FUNDS REGULATION § 42:2.2 (3d ed. 2013).

**V.      Plaintiffs Fail To Allege Facts Calling Into Question The Independence Or
         Conscientiousness Of The Independent Trustees.**

        Turning to Defendants' arguments regarding the Board, Plaintiffs once again urge the

Court to give their conclusory, legally deficient allegations a free pass, arguing that the "Board's

independence and the thoroughness of its process . . . are fact-intensive inquiries improperly

raised at the motion to dismiss stage."  Opp'n Br. at 3.   But, Plaintiffs have it backwards.  As

discussed in Defendants' Opening Brief, the Independent Trustees are *presumed* as a matter of

law to be independent, and the burden is on Plaintiffs to show that the Board's decision is not

entitled to deference.  *See* Mot. to Dismiss Br. at 21 (*citing Krantz v. Prudential Inv. Fund Mgmt.

LLC*, 305 F.3d 140, 143 (3d Cir. 2002).  This Plaintiffs have failed utterly to do.  The lack of any

such allegations in the Amended Complaint is especially striking because Plaintiffs had the

benefit of the minutes of the Board meetings during which the Board discussed and approved the

Advisory Agreements.  *See* Joint Discovery Plan Under Rule 26(f) (May 22, 2014), ECF No. 35.

        In their Amended Complaint, Plaintiffs have rehashed a number of legally insufficient

claims from their original Complaint in an attempt to rebut this presumption.  They continue to

argue that the Board lacked independence or conscientiousness because the Independent Trustees

are compensated for their service (Am. Compl. ¶ 69), oversee numerous funds (*id.* ¶ 71), and

approved SIMC's advisory fee even though the Funds "underperform[ed] their primary

---

        and securities lending arrangements survived motion to dismiss "by only the narrowest of
        margins"); *Batra v. Investors Research Corp.*, 144 F.R.D. 97 (W.D. Mo. 1992)
        (documents pertaining to defendants' pension fund clients were discoverable).

benchmarks" *(id.* ¶ 74).[20]  Defendant's Opening Brief explained why each of these allegations is insufficient as a matter of law.  *See* Mot. to Dismiss Br. at 21-25.  In response, Plaintiffs simply duck these issues, stating perfunctorily that the numerous cases Defendants cite are "inapplicable here because none assert Plaintiffs' core sub-adviser allegations."  Opp'n Br. at 37.  This argument is difficult to understand; the cases at issue deal with the legal sufficiency of allegations attacking the Board's independence and process.  The fact that Plaintiffs have asserted a Section 36(b) claim that involves sub-advisors hardly changes the analysis of a board's independence and the quality of the decision-making process it employs.[21]

The few Section 36(b) cases that Plaintiffs cite actually support Defendants' argument. In *Kasilag*, plaintiffs alleged that the adviser was the subject of an SEC cease and desist proceeding and the board had continued to approve large fees "for an adviser that had been found guilty of committing fraud and deceit."  2012 WL 6568409, at *7.  The plaintiffs in *Reso v. Artisan Partners Limited Partnership* alleged that the advisor provided "misleading information

---

[20]    Plaintiffs also assert that the "part-time nature" of the Independent Trustees' positions on the Board calls into question their conscientiousness and care.  Opp'n Br. at 36.  This allegation also fails as a matter of law.  *See Strougo v. BEA Assocs.*, 188 F. Supp. 2d 373, 382 (S.D.N.Y. 2002) ("no authority has held that full-time occupations . . . sufficiently state a claim of inattention to duty").

[21]    Plaintiffs appear to have abandoned their allegations that the Board "approved the Advisory Agreements based on a cursory analysis" (Am. Compl. ¶ 75), that its "reasoning is poorly described" in the Annual Report (*id.* ¶ 76), and that it did not obtain "adequate information regarding the allegations contained in [the] complaint."  (*id.* ¶ 73.) Indeed, although Defendants addressed these allegations fully (*see* Mot. to Dismiss Br. at 23-26), Plaintiffs do not even attempt to resuscitate them.  Instead, Plaintiffs now twist both their allegations and the facts, claiming that the Board made an "unsupported conclusion that the SEI Funds received benefits from economies of scale despite the lack of breakpoints and fee waivers."  Opp'n Br. at 36.  As an initial matter, the Funds in fact benefit from significant fee waivers, as Plaintiffs admit.  *See supra*, Section III.C.1.; Am. Compl. ¶ 54.  Further, as discussed in Defendants' Opening Brief (and not addressed in Plaintiffs' Opposition), the summary of the Board's decision-making process in the Annual Report does not support Plaintiffs' argument that the Board concluded that economies of scale exist.  *See* Mot. to Dismiss Br. at 33.

to the directors." 2011 WL 5826034, at * 6 (E.D. Wisc. Nov. 18, 2011). And in *Dumond v. Massachusetts Financial Services Co.*, the plaintiffs alleged that the board had received "virtually no information" about comparable fees. No. 04-11458, 2006 WL 149038, at *3 (D. Mass. Jan. 19, 2006). Here, of course, Plaintiffs do not, and cannot, make allegations like these. As such, even the cases Plaintiffs cite make plain that Plaintiffs have failed to impugn the Board's independence or process.

## VI.  PLAINTIFFS FAIL TO ALLEGE A SECTION 36(B) CLAIM REGARDING ADMINISTRATIVE FEES.

Turning to Plaintiffs' allegations regarding administrative fees, Plaintiffs' claim once again fails. As an initial matter, Plaintiffs fail to allege a single fact indicating that SIGFS's services are insignificant, poorly performed or of no value. Instead, they rely entirely on self-serving, conclusory characterizations of SIGFS's services as "simple" and "supervisory." (Am. Compl. ¶ 95; *see also* Opp'n Br. at 38-39) But, these conclusory characterizations are no substitute for well-pleaded facts, and in any event, they are belied by other more specific allegations in the Amended Complaint. Plaintiffs themselves concede that SIGFS provides "services such as regulatory reporting, office space, equipment, personnel and facilities, and other administrative services" as well as "transfer agency services" in exchange for its fee. (Am. Compl. ¶¶ 90, 93.) In addition, the Administrative and Transfer Agency Agreements -- documents that the Amended Complaint explicitly relies upon (*id*. ¶¶ 90, 91.) -- contain a five-page litany of specific tasks SIGFS carries out. *See, e.g.*, SIIT Administration and Transfer Agency Agreement, Schedules A-C (Ex. 3 – ECF No. 57); *see also* Mot. to Dismiss Br. at 12-14.[22]

---

[22]     Plaintiffs also assert that a "number of other administrative services that are typically performed by the fund administrator, such as printing, registration fees, custodian fees and nebulous 'other expenses,' are not even provided by SIGFS." Opp'n Br. at 38.  As

In the face of these fatal admissions, Plaintiffs grasp at familiar straws, arguing that the "Court should once again ignore Defendant SIGFS' counterargument that many of these services are 'specialized' [ ] because it is a fact-based argument that is appropriate only at summary judgment." Opp'n Br. at 39. However, Defendants are not relying on any characterization of SIGFS's services as "specialized"; rather, Defendants have simply pointed out facts, apparent from the Amended Complaint itself, showing that SIGFS performs a multitude of services. These services are the exact types of facts that undermine Plaintiffs' ability to state a claim under the *Jones* "so disproportionate" exception to the deference normally afforded to a board.

Not only do Plaintiffs admit that SIGFS performs a host of services, Plaintiffs actually concede that SIGFS's fees for these services are ***below*** the industry average. Plaintiffs allege that SIGFS charges a fee of 0.24% for one of the SEI Funds, 0.35% for three Funds, and 0.45% for one Fund (Am. Compl. ¶ 92) -- an average fee of 0.348%. Plaintiffs acknowledge that this "administration fee covers the administrative ***and*** transfer agency services that defendant SEI Funds Administrator provides to the fund." (*id*. ¶ 93.) (emphasis added). According to Plaintiffs' own Amended Complaint, "transfer agent fees for mutual funds average fifteen basis points" (*id*. ¶ 94) and "[m]utual funds, on average, charge administration fees of only twenty-one basis points" (*id*.) -- a combined industry average of 36 basis points. Thus, based on Plaintiffs' own allegations, SIGFS's fees of 35 basis points are below average. Importantly, although Defendants pointed to these admissions in their initial motion, Mot. to Dismiss Br. at 42 n.27,

_____

explained in Defendants' Opening Brief, Plaintiffs do not (and cannot) allege that these separate services performed by third parties overlap with, or in any way diminish SIGFS's myriad of other tasks.  *See* Mot. to Dismiss Br. at 41-42.  Further, Plaintiffs' never actually allege that such other services are "typically performed by the fund administrator" -- nor could they, as this statement is inaccurate, as a glance at any other funds' financial statements would show.

Plaintiffs ignore them entirely in their response.   Thus, Plaintiffs in this instance have completely failed, once again, to set forth any basis for disregarding the judgment of the trustees.

## VII.   PLAINTIFFS ADMIT THEIR CLAIM IS UNTIMELY.

Plaintiffs' claim fails for a second, independent reason:  Plaintiffs' claim is untimely under Section 36(b).  Under the statute, "[n]o award of damages shall be recoverable for any period prior to one year before the action was instituted." 15 U.S.C. § 80a-35(b)(3).  Indeed, Plaintiffs' original Complaint was dismissed for their failure to plead any recoverable damages under this section.  *See* Order (Aug. 28, 2014), ECF No. 50.  They have made precisely the same mistake yet again.

Plaintiffs filed the Amended Complaint on October 2, 2014; therefore, they cannot recover damages for any period prior to October 2, 2013.  Here, the Amended Complaint only contains allegations related to the fees paid to SIMC during the Funds' 2013 fiscal years, which Plaintiffs acknowledge ended on August 31, 2013 or September 30, 2013, *i.e.,* before the earliest date (October 2, 2013) permitted by the substantive statute of limitations contained in Section 36(b). (Am. Compl. ¶ 40 n.5).

In the hopes of saving their claim, Plaintiffs try to rely on the date they filed their original Complaint, December 11, 2013.  But Plaintiffs ignore the fact that the "relation back" principle is inapplicable to Section 36(b) claims: the one-year limitation on the recovery of damages under Section 36(b) is a substantive, not procedural, right and therefore the "relation back" doctrine cannot be used.  *See In re Franklin Mut. Funds Fee Litig.*, 478 F. Supp. 2d 677, 685 (D.N.J.

2007) (rejecting use of the "relation back" principle in Section 36(b) claims); *Boyce v. AIM Mgmt. Grp. Inc.*, No. 04-2587, 2007 WL 7117575, at *6 (S.D. Tex. Sept. 17, 2007) (same).[23]

Nor are Plaintiffs correct when they claim that they have, in fact, alleged facts about fees using 2014 data or utilized the most up-to-date information available at the time of filing.  As even a cursory review makes plain, the Amended Complaint exclusively uses fee data from fiscal year 2013.  *See, e.g.*, Am. Compl. ¶¶ 2, 40, 41.  Indeed, the paragraphs of the Amended Complaint that supposedly contain data about 2014 fees actually relate to an SEC exemptive order (*id*. ¶ 41) and the existence of an Administrative Agreement in place with SIGFS (*id*. ¶ 90); they do not involve the fees received.[24]  Plaintiffs' also claim that they used the most up-to-date information available at the time of filing. *See* Opp'n Br. at 42.  But this is also not true. Plaintiffs could have relied upon the 2014 semi-annual reports, available months before the Amended Complaint was filed, but for some reason chose not to do so.[25]  Thus, Plaintiffs' Amended Complaint is untimely as a matter of law and, for this reason alone, it should be

---

[23]     Furthermore, courts use the date of the *amended complaint* when a plaintiff failed to properly plead a Section 36(b) cause of action in the original complaint.  *See Boyce*, 2007 WL 7117575, at *6 (using the date of the amended complaint because "[u]ntil plaintiff pleaded properly a cause of action falling within the statutory parameters . . . , no section 36(b) claim was pleaded.")*; see also In re Franklin*, 478 F. Supp. 2d at 684 (using the filing date of the amended complaint because the original complaint did not state a cognizable cause of action). Here, Plaintiffs failed to plead a proper Section 36(b) action in the original complaint, as evidenced by the Court's dismissal of the original Complaint.  *In re Dreyfus Mut. Funds Fee Litig.*, 428 F. Supp. 2d 342, 352 (W.D. Pa. 2005), which Plaintiffs also cite, offers them no support, as there was no discussion of whether the date of the original or amended complaint controlled, since the defendant had ceased distributing the challenged funds nearly three years before the case was instituted.

[24]     While Plaintiffs also argue that the one-year damages period does not limit the presentation of facts to that period, their argument is irrelevant because they have not alleged *any* facts for the one-year period preceding the filing.

[25]     The Funds' Semi-Annual Reports were publicly available on May 5, 2014 (the SEI Intermediate Term Municipal Fund) and June 9, 2014 (the four other SEI Funds) and contain fee data for the first six months of fiscal year 2014.

dismissed.  Given that this is Plaintiff's second opportunity to try to plead damages in the relevant time period, and they have again failed to do so, the Amended Complaint should be dismissed with prejudice on this ground, as well as the others discussed above.

## <u>CONCLUSION</u>

For the reasons explained above and in Defendants' Opening Brief, Defendants respectfully requests that the Court dismiss the Amended Complaint with prejudice.

January 30, 2015

Respectfully submitted,

DECHERT LLP

/s/ *Steven B. Feirson*
Steven B. Feirson (PA I.D. No. 21357)
  steven.feirson@dechert.com
Michael S. Doluisio (PA I.D. No. 75060)
  michael.doluisio@dechert.com

Of counsel:

Charlotte K. Newell (PA I.D. No. 317748)
  charlotte.newell@dechert.com

Matthew L. Larrabee
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036
Tel:  (212) 698-3578
E-mail:  matthew.larrabee@dechert.com

Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
Telephone:     (215) 994-2489

Emily Shea
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
Tel:  (202) 261-3378
E-mail:  emily.shea@dechert.com

*Attorneys for Defendants*

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 30th day of January, 2015, I filed true and correct copies of

the foregoing **DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO**

**DISMISS THE AMENDED COMPLAINT** with the Clerk of the Court using the Electronic

Filings ("ECF") System, which will send notification to the below counsel of record.

Brian J. Robbins
Stephen J. Oddo
Edward B. Gerard
Justine D. Rieger
ROBBINS ARROYO LLP
600 B Street, Suite 1900
San Diego, CA 92101
brobbins@robbinsarroyo.com
soddo@robbinsarroyo.com
egerard@robbinsarroyo.com
jrieger@robbinsarroyo.com

Richard A. Maniskas
995 Old Eagle School Road, Suite 311
Wayne, PA 19087
rmaniskas@rmclasslaw.com

Dated:  January 30, 2015                                    */s/ Steven B. Feirson*

29